16 N.J. Super. 295 (1951)
84 A.2d 631
WELSH FARMS, INC., ET AL., DAIRYMEN'S LEAGUE CO-OPERATIVE ASSOCIATION, INC., AND DAIRY DALE MILK, INC., ET AL., PETITIONERS-APPELLANTS,
v.
DANIEL BERGSMA, M.D., M.P.H., STATE COMMISSIONER OF HEALTH, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1951.
Decided November 16, 1951.
*297 Before Judges McGEEHAN, JAYNE, and WM. J. BRENNAN, JR.
Mr. John Martin, of the Pennsylvania bar, and Mr. Edward Gilhooly argued the cause for appellant Welsh Farms, Inc. (Messrs. Gilhooly & Yauch, attorneys; Messrs. Duane, Morris & Heckscher, of the Pennsylvania bar, on the brief).
Mr. William L. Dill argued the cause for appellant Dairymen's League Cooperative Association, Inc. (Messrs. Stryker, Tams & Horner, attorneys; Messrs. Duane, Morris & Heckscher, of the Pennsylvania bar, on the brief).
Mr. Harry Polikoff, of the New York bar, argued the cause for appellant Dairy Dale Milk, Inc. (Messrs Toner, Speakman & Crowley, attorneys).
*298 Mr. Joseph A. Murphy, Deputy Attorney-General, argued the cause for respondents (Mr. Theodore D. Parsons, Attorney-General of New Jersey, and Mr. Joseph Lanigan, Deputy Attorney-General).
The opinion of the court was delivered by JAYNE, J.A.D.
The declaration of our conclusions in these consolidated actions may well begin with a prefatory statement more informative of the subject matter of our deliberations than merely to say that the proceedings implicate the validity of certain administrative regulations promulgated by the State Department of Health and filed with the Secretary of State on July 5 and July 10, 1950. An account of some antecedent events and of the conditions comprising the environment in which the regulations were ordained will add illumination to the factual picture exhibited to us for consideration.
New Jersey is characterized as a milk deficiency state in that the resident producers supply less than 50 per cent of the State's requirements. The deficit is satisfied by the importation of milk into New Jersey through the channels of interstate commerce from sources in the states of New York, Pennsylvania, Maryland, and others.
The plaintiffs, who seek our declaratory judgment (Rule 3:81-10), some of whom have also sought a review pursuant to Rule 3:81-8, all hold temporary permits or creamery licenses issued to them by the State Department of Health enabling them to receive, ship, store, process and vend milk within this State.
The interest of the parties in this litigation is manifested by the disclosure that the Milk Dealers' Association of Northern New Jersey, consisting of 32 members, distributes approximately 75 per cent of all milk supplied in the nine northern counties. The South Jersey Milk Dealers Association, Inc., composed of 55 members, distributes approximately 80 per cent of all of the milk sold in the southern New Jersey area. The 30 members of the Trenton Milk Dealers' *299 Association, Inc., supply about 80 per cent of the milk consumed in the Trenton territory. The New Jersey Milk Industry Association, Inc., with a membership of 82, and the Dairymen's League Cooperative Association, Inc., with a membership of about 27,000 milk producers, distribute throughout the State. The plaintiffs comprise groups of dealers of milk, of whom some are located within and others without New Jersey.
It is exceedingly significant to recognize that the milk which is transported into New Jersey from the surrounding states is exposed to the same sanitary regulations and must meet the same standards of identity and quality as that produced in New Jersey.
The regulation and control of the production, processing, distribution and sale of milk have engaged studious legislative and administrative consideration in recent years. Witness the eloquent diction of the excerpt taken from the preamble of L. 1941, c. 274, p. 713:
"that it is made necessary by the conditions of unfair, unjust, destructive and demoralizing practices, heretofore existing or threatened and presently threatening, in the production, sale and distribution of milk which are likely to result in the demoralization of the agricultural interests of this State engaged in the production of milk and the creation of conditions inimical to the health of the public of this State; that it is the policy and intent of this act to prevent these unfair, unjust, destructive and demoralizing practices by providing a reasonable return for the milk producer, so as to prevent possible curtailment of a sufficient supply of fresh, wholesome, sanitary milk for our citizens."
Following the Milk Control Act of 1941 (L. 1941, c. 274) came the Reorganization Act of 1948 (L. 1948, c. 447), which constituted the Department of Agriculture a principal department in the executive branch of the State Government and transferred the functions of milk control within that department to the Office of Milk Industry. Vide, Como Farms, Inc., v. Foran, 6 N.J. Super. 306 (App. Div. 1950). Pursuant to the legislative authority so conferred upon it, *300 the Office of Milk Industry has assumed the regulation of producer, dealer, and retail minimum prices of milk within our State.
The realities of the situation did not, however, fade away as gently as a winter sunset. The New Jersey producers cannot, it is said, adequately supply the demands of the New Jersey consumers. The Office of Milk Industry has no legal authority to regulate the minimum prices in the surrounding milk markets which often have an available supply of milk of equal quality at a less price. See, State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 508 (E. & A. 1935). Hence it is asserted by the plaintiffs that the only subordinate and pragmatical objective is to endeavor so to arrest the flow into New Jersey of out-of-state milk as to insure the exhaustion of the domestic production before recourse is had to foreign sources.
Nevertheless the importation of milk has never been reduced to a trickle and the plaintiffs declare that the administrative regulations here under judicial scrutiny are but crafty contrivances to suppress the interstate trade.
It is explained that the major points of the regulations here impugned were previously embodied in Senate bills Nos. 318 and 319 and in Assembly bill No. 429 introduced during the 1950 session of the Legislature and that they failed of passage. The Commissioner of Health acknowledged that "the impetus for the formulation and publication of these regulations came from outside your (his) Department." Thus the plaintiffs intimate that the Department of Health manifestly succumbed to the cozy warmth of an applauding group.
All of the foregoing evidence was evidently introduced to embroider the substratum of fact underlying the specific questions to be answered.
Initially we are not insensible to the general principle that administrative regulations have in their support the rebuttable presumption of validity and that the administrative agency has acted lawfully, regularly, and not oppressively. *301 State Board of Milk Control v. Newark Milk Co., supra; Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949); 42 Am. Jur. 680, § 240. It may be supposed that almost every regulation has a plus and a minus. It is not often that one of such is an unanimous blessing.
However, if the measures invoked are within the lawfully delegated authority of the agency and tend to serve a legitimate interest of society, the wisdom, need and appropriateness of the course pursued is not ordinarily a justiciable question. Abelson's, Inc., v. N.J. State Board of Optometrists, 5 N.J. 412, 420 (1950); 42 Am. Jur. 610, § 209.
The suggestion that the instant regulations were promulgated without a preliminary submission to a public hearing and without accordant findings to support them is, in the absence of some constitutional or statutory requirement, of no legal significance. State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 522 (E. & A. 1935); In re Port Murray Dairy Co., 6 N.J. Super. 285, 293 (App. Div. 1950); 42 Am. Jur. 423, § 94. Contrast R.S. 26:1A-7.
Nor do we ascribe cogency to the premise that the authority to formulate regulations of this nature is solely confined to the precinct of the Public Health Council of the State Department of Health, although its code may within the scope of its appropriate functions deal with the production, distribution and sale of certified milk. L. 1947, c. 177, p. 795; R.S. 26:1A-7. In any construction of its delegated authority, the power of the Council is limited to the establishment of sanitary regulations to preserve and improve the public health. So also it must be realized that the State Department of Health is likewise the creature of the Legislature, from which its powers are inherited. The Department has no inherent jurisdiction to make laws or to exercise the full police power of the State Government. Such agencies are to be confined within the limits that a construction of the grants of powers will assign to them, and those recognizable *302 delegated powers must be employed in a reasonable manner.
In the final analysis, it is the nature of the subject matter and the end to be served that determine the quality, content and authenticity of the regulatory power.
The pressure of the attack upon the validity of the regulations at hand is accentuated by the insistence that they offend the Federal Constitution. The commerce clause presents the remarkable instance of a national power which was comparatively unimportant for three-quarters of a century and which has since in peace time so developed that it is now, in its nationalizing tendency, perhaps the most conspicuous power possessed by the Federal Government. Farrand, Records of the Federal Convention, vol. II, p. 308, vol. III, pp. 478, 547; The Federalist, No. XLII; 1 Curtis, History of the Constitution 502; Story, The Constitution, sec. 259, 260; Fiske, The Critical Period of American History, 144; Warren, The Making of the Constitution, 567; Justice Frankfurter, The Commerce Clause; Ribble, State and National Power over Commerce.
And yet, for the protection of the public health and safety few businesses other than public utilities have been more thoroughly regimented and regulated by the states within constitutional limitations than the milk industry. Milk is an essential item of diet. It is a well known medium for the growth of bacteria. Vigilance against its contamination is imperative.
Of immediate relevancy is the statement of Mr. Justice Jackson, who delivered the opinion of the court in Hood & Sons v. Du Mond, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949):
"This distinction between the power of the State to shelter its people from menaces to their health or safety and from fraud, even when those dangers emanate from interstate commerce, and its lack of power to retard, burden or constrict the flow of such commerce for their economic advantage, is one deeply rooted in both our history and our law."
*303 Justice Cardozo, speaking for the same court in Baldwin v. Seelig, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032 (1935), had indicated that the economic objective, as distinguished from any health, safety, and fair dealing purpose of regulation, was the root of its invalidity.
We think that it must be acknowledged without further comment that the police power may not be employed by the state of destination for the sole purpose of erecting stone by stone an economic barrier against competition with the products of another state. Such ramparts, however advantageous to the economic security of our local producers, nonetheless impede the universally desirable mobility of commerce.
Also must we heed the argument that the regulations before us were not promulgated by an agency to which the Legislature has confided the duty to take measures requisite for the elimination of destructive trade practices, ruinous competition, and the maintenance of price levels, but by a department whose sphere of authority is limited to matters of public health. Cf. Dairy Products Law, R.S. 24:10-1, et seq., and Milk Control Act of 1941, c. 274, § 21; R.S. 4:12A-21. Nevertheless, we are importuned in this instance to fuse legal reasoning with the neoteric social thought.
In this field of inquiry it is not unprecedented for the divergent and oppugnant arguments of counsel to project slender distinctions between direct and indirect burdens upon interstate commerce. That the commerce clause impliedly imposes some restraint upon the governmental power of the State is indubitable. The limitations in the given case are the offspring of the implications of meaning of the clause, exemplified successively by the decisions of Justices Marshall, Taney, Waite, and Fuller and ever since projected in cases perhaps less capacious but scarcely less controversial. It may be that this implied negative operation of the clause on state power has been influenced beyond the bounds of rigorous legal logic by the evolutions of time, experience and trends of policy, but such thin shades of difference disappear where it is made manifest that the real purpose of the regulation *304 in question, as well as its naturally foreseeable tendancy, is to suppress or mitigate the consequences of competition between the states.
"Economic welfare is always related to health, for there can be no health if men are starving. Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the people of the several states must sink or swim together and that in the long run prosperity and salvation are in union and not division." Baldwin v. Seelig, supra. On the other side of the coin we perceive that in the interest and promotion of the public health there is the need of an adequate supply of milk for the inhabitants of the State.
Certainly it is not to be supposed that a commodity, by reason of its extra-state origin, is completely immunized by the commerce clause from the exercise of state regulatory power. Reasonable regulation for the public good of a business affected, as the cases say, with a public interest, is admittedly permissible under the police power. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504 (E. & A. 1935).
We might embark upon an elaborate description of the characteristics of the commerce clause, its dimensions, its tolerances and its applications, were we not aware that the subject has been so frequently discussed in prior opinions.
In this period during which the clash of the divergent interests continues to resound, it is cautious to explain that our conclusions here expressed reflect only our conception of the composition and intrinsic character of the particular regulations *305 under review, examined in the light of the evidence adduced in these actions.
So the interrogatories addressed to us as they recede in our reflections seem to converge upon the questions: (1) are these regulations inherently health or economic measures; (2) are their purposes and effects beyond the constitutional boundaries of the state police power; (3) are they in relation to the public health arbitrary, unreasonable and capricious; and (4) does the so-called 50 per cent command regulation, in any event, lack sufficient standards to be enforceable?

I

THE FIFTY PER CENT COMMAND REGULATION
"WHEREAS, It is necessary to assure an adequate supply of milk for the inhabitants of this state, and the amount of milk available varies at different seasons of the year,
THEREFORE, Be It Resolved, that the State Department of Health does hereby require that all plants approved for the distribution or sale of fluid milk in New Jersey shall have their permanent permit so conditioned that New Jersey can command fifty per cent (50%) of its approved milk at any time during the period of the permit."
Within the area of our research this regulation seems to be one "wrapped in the solitude of its own originality." Our attention has, however, enveloped an acquaintance with the resolution adopted in 1946 by the Department of Health of the City of New York which required all approved milk-receiving stations or plants to ship into the city such percentage of their total receipts of milk and in such form (either fluid milk, cream, cheese, or other milk products) as the commissioner of health of the city should from time to time determine, and we observe that the trial court in which the validity of the command was challenged granted the motion for an injunction pendente lite against its enforcement on the ground that the regulation was not a sanitary regulation but was a burden on interstate commerce. Westchester County v. Department of Health, 65 N.Y.S.2d 313 *306 (Sup. Ct. 1946), affirmed 297 N.Y. 491, 74 N.E.2d 190 (Ct. of App. 1947). We have noticed, too, that in 1927 the legislature of the State of Maryland enacted a statute requiring oyster packers, as a condition for the issuance of a license, to agree to deliver to the state ten per cent of the empty oyster shells, even though some of the live oysters came from other states. Leonard & Leonard v. Earle, 279 U.S. 392, 49 S.Ct. 372, 73 L.Ed. 754 (1929).
We are aware that reasonable regulations designed to secure the cleanliness, wholesomeness and purity of milk have been judicially sustained with conspicuous unanimity but with a like concordant adherence to the principle that the regulation must be reasonable and possess a recognizable adaptation to the object sought to be accomplished by it. Regal Oil Co. v. State, 123 N.J.L. 456 (Sup. Ct. 1939); N.J. Good Humor, Inc., v. Bradley Beach, 124 N.J.L. 162 (E. & A. 1940).
Accordingly we are asked whether the above-quoted regulation to which we now specifically allude has any reasonable relation to the public health and will in any consequential degree conduce to its preservation, or has it the genuine and direct object and purpose to promote in a forbidden manner the economic welfare of our local milk producers. Cf. Labash v. Bd. of Embalmers, &c., 12 N.J. Super. 334 (App. Div. 1951). "If the dominant purpose be the advancement of private interests under the guise of the general welfare, there is a perversion of the power." Reingold v. Harper, 6 N.J. 182, 192 (1951).
"Whatever relation there may be between earnings and sanitation is too remote and indirect to justify obstructions to the normal [free] flow of commerce in its movement between states," said the court in Baldwin v. Seelig, supra.
But let us first consult the evidence pertaining to this regulation. On August 3, 1950, the Commissioner of the State Department of Health replied in writing to an inquiry concerning this particular regulation and others, the relevant portion of which reads:
*307 "Receipt is acknowledged of your letter of July 18th in which you submit certain queries relative to the additional rules and regulations recently promulgated by the Health Commissioner:

* * * * * * * *
3. `In connection with the regulation which requires the permit be conditioned so that the State of New Jersey can command 50% of the suppliers output of the approved plan at any time, we would like to have answers to the following questions which have already been brought up by the members of the Association we represent:
`Does the regulation permit the call plan to operate on any basis less than 50%?' Answer: Yes.
`Would it be possible for the Department of Health to make a call upon certain permit holders to the extent of 50% and no calls at all upon other permit holders?' Answer: Yes.
`The regulation indicates that the State of New Jersey can command 50%. What officers or group of officers shall represent the State of New Jersey in making the command?' Answer: The Attorney General, the Commissioner of Health and the Director of the Office of Milk Industry.
`Would a permit holder called upon to ship 50% of his milk to New Jersey be forced to ship such milk at perhaps lower than the prevailing market price for such milk?' Answer: Not a Health problem.
`Would compliance with the regulation exist if a shipper made his milk available at a reasonable prevailing price on a cash basis, even though there was no demand for such milk?' Answer: Not a Health problem.
`Would 50% of the approved milk be commanded only on the basis of a declaration of emergency by some official following a public hearing open to all interested parties?' Answer: No.
`Would the period during which a permit holder was commanded to ship 50% of his milk be at a specific number of days?' Answer: Not necessarily. (See subsequent answers.)
`Would the 50% rule, if invoked, be applicable throughout the State of New Jersey, or only for certain cities, counties, or other geographical areas of the State?' Answer: Not necessarily. (See subsequent answers.)
`Would the command plan be applied to the plants most economically situated to the particular cities or areas where a shortage exists? In other words, if there was a shortage in North Jersey, would the plants regularly shipping to South Jersey be asked to ship milk to North Jersey, and vice versa?' Answer: This would be decided by the Attorney General, the Commissioner of Health and the Director of the Office of Milk Industry in view of the situation existing at the time.
`Would the obligations under the call plan be satisfied by a multiple plant operator if he shipped the required amount of milk from a *308 single or a few plants, rather than a specified percentage from each of his approved plants?' Answer: At each plant in view of the situation existing at the time the call plan became operative.
`Would it be obligatory on the part of the shipper to ship his milk to a particular handler designated by the Department of Health?' Answer: No.
`What would be expected of a plant operator who was called to deliver milk to New York or some other area and, at the same time, was called upon to deliver milk to New Jersey?' Answer: This would be a plant problem."
Not uncommonly admissions or concessions anent controversial subjects are made obliquely. The Commissioner in his communication appears to have acknowledged that in pursuance of this regulation the department may at will address its command to some one or chosen few permit holders to the full extent of 50 per cent of their approved milk at any moment and without any specified advance notice, and refrain from making any demand whatever on other permit holders. Any resultant hardship is classified as a "plant problem," viz., one which the plant operator must grin and bear.
Furthermore, we notice the anticipation of the Commissioner that the administration of the provision is to be exercised by a body of three, of whom the Attorney-General of the Law Department and the Director of the Office of Milk Industry constitute the majority. We do not understand that health measures are within the domain of the powers legislatively conferred upon the Director of the Office of Milk Industry. In re Port Murray Dairy Co., supra. Is the selection of particular plants to be called upon to supply milk to become by the action of the Department of Health a new-born directorship within the province of the Law Department? By what standard is the choice of plants in such instances to be made? See Veix v. Seneca B. & L. Ass'n., 126 N.J.L. 314, 321 (E. & A. 1941); Van Riper v. Traffic Tel. Workers' Fed. of N.J., 2 N.J. 335, 353 (1949).
But we are furnished additional enlightenment concerning the probable object and effect of this regulation by the *309 testimony, from which we extract the following typical passages:
"Any requirement that a plant must ship, or be prepared at any time to ship, fifty per cent of its intake to a given market has a number of consequences.
In the first place, it automatically means that this percentage of its receipts cannot be contracted for or sold, in advance, in any other market than the commanding one. This means that, whether or not there is a current or future demand for 50 per cent of the plant intake in such market  New Jersey in this case  a volume of milk equivalent to at least 50 per cent of the intake must be held in reserve against such possible command. The mere fact of changeable and unpredictable supply conditions means that the quantity of milk required to be reserved for such command is itself changeable and unpredictable. In short, 50 per cent of an unknown quantity is an unknown quantity. The facts of life in the dairy industry and at any given milk plant are such that this quantity is only known after the milk is actually delivered.
Fluid milk is highly perishable and must be moved daily to some market. If, in anticipation of this command, offers of other markets to buy are rejected, the handler is then left to seek an outlet for this reserve of milk held for anticipated command, which might actually never occur. Naturally, under such circumstances, the shipping handler would be forced to dispose of this milk, either at a loss or an unremunerative consideration. This risk of such loss would make plants like ours prefer to withdraw from New Jersey.

* * * * * * * *
These conditions, as you can well appreciate, are such under which no plant could operate. Faced with such conditions as the 50 per cent regulation, the plants which I represent, and other similarly situated, would have no alternative but to let their New Jersey Health approvals lapse or be cancelled out. The result, therefore, is not to insure an adequate supply of milk for the inhabitants of New Jersey, but rather to deplete and destroy present sources of supply.

* * * * * * * *
The main or principal business at the plants which I represent is the shipment of fluid milk in bulk to other dealers for resale. Because fluid milk is highly perishable and must be moved daily to market and it is a matter of necessity that the maximum part of the intake at these plants be disposed of by arrangements made in advance of the receipt of the milk. Such disposition under normal conditions is, for the most part, arranged far in advance, generally by annual contract with buyers made in the spring of the year; sometimes by contracts made for shorter periods, but for months ahead. These contracts will apply to stated periods of time, to stated quantities of milk and will be to a named buyer, of course; and they will carry a specific or predetermined price. The milk business *310 has so many uncertainties, for both seller and buyer, that such contracts constitute a necessary hedge for both parties, giving them some minimum assurance of a market on the one hand, and a supply on the other.
* * * To the extent that plants such as ours are compelled to make such contracts for shipment into New Jersey, we have already pointed out the manner in which we are injured. However, we are deprived of the ability to contract for the sale of our milk to other markets if 50 to 55 per cent of our intake must be held available for possible command by the State of New Jersey.
Now, clearly, buyers in Pennsylvania or Virginia would have actions against us for breach of contract if we had to divert milk from such buyers so as to comply with a 50 per cent command promulgated by the State of New Jersey.
In short, this 50 per cent regulation, whether a command is ever issued under it or not, destroys our ability to market our product by normal means, either in the State of New Jersey or out of it. Beyond question, if this 50 per cent regulation becomes effective, our plants will be forced to drop their New Jersey approval, thereby depriving the inhabitants of New Jersey of the benefits of our supplies."
If the information imparted by the Commissioner in his communication affords us only a twilight glimpse of the features of the regulation, certainly the testimony of the senior food and drug inspector of the Department of Health is resplendent. We quote:
"Q. Do the standards of identity, quality and purity differ with respect to the milk that is produced within the State of New Jersey from that milk which is produced outside of the State of New Jersey? A. No, sir.
Q. What has been your experience with respect to the standards of quality and purity of out-of-State produced milk? I suppose when I use the word `standards' I should use something by way of comparison, and I would compare that with the milk produced within the State of New Jersey. A. You mean a comparison of how they conform to the standards?
Q. Yes. A. I'd say that the out-of-State milk compares very favorably with in-State produced milk.

* * * * * * * *
Q. Now I direct your attention to Exhibit C attached to our Petition, which we have commonly referred to as the 50 per cent command regulation, and I ask you whether or not the enforcement of that regulation would aid or assist your Department to improve the purity or quality of milk or prevent disease. A. In an indirect way it might affect 
*311 Q. The quality or purity of milk? A. I'm speaking of this, that if 
Q. Not quantity; I'm talking about quality. A. Quality, yes, sir. We have a small force of men and if the supply can be kept adequate by a smaller number of plants, we could give those plants more supervision. That's the only basis that I know of.

* * * * * * * *
Q. Will you say that indirectly this regulation might aid your Department if you could command a great amount of milk, you'd have to make fewer inspections and therefore you could probably increase the standards of the farms? A. No. I believe I said  if I didn't, I meant to say  that the fewer number of plants under supervision, the greater would be our supervision of those plants.
Q. Now, of course, if you enlarged your force you could keep the same standards as you desired, could you not? A. Yes, sir.
Q. And it is only because you have a smaller force that you can't make the inspections as frequently and you cannot inspect as many places as you would if you had a larger force? A. That's right.
Q. And it is only to that extent that you say that the purity or quality of milk  that the enforcement of the last regulation might improve the purity or quality of milk, is that right? A. Yes.
Q. Because of the smallness of your force. A. That's right.

* * * * * * * *
Q. I understood you to say that if you had fewer sources of supply to inspect and you had an adequate force to inspect them that then you could probably set the standards which you desired more to your satisfaction. But I am taking into consideration the force that you have at the present time and the necessity for out-of-State milk, realistically as they are at the present time, then the mere fact you could command 50 per cent of the supply of permit holders would not aid or assist in the purity or quality of milk or prevent disease. A. You mean the very fact that we can control, that we might control 50 per cent of the supply would affect the quality of the milk?
Q. Yes. A. That fact in itself would not affect the quality of the milk.
Q. Now, Mr. Abbott, where the holder of a permit issued by your Department under Title 24 meets the requirements of the Health Department, would this last regulation assist your department to determine whether an applicant for a permit under Title 24 should be granted or revoked? A. In the past we have granted permits where the plant and the supply have met the requirements. If this were in effect, that would be an extra condition which would have to be met in granting it.

* * * * * * * *
Q. Would the insistence that an applicant for a permit agree, as a condition to the issuance of his permit, that he would place at the command of the State of New Jersey 50 per cent of approved milk aid or assist your Department to determine whether or not an application for a permit under Title 24 should be granted or revoked on the basis of the quality or purity of the milk? A. No, sir."
*312 "If the City of Madison prefers to rely upon its own officials for inspection of distant milk sources, such inspection is readily open to it without hardship for it could charge the actual and reasonable cost of such inspection to the importing producers and processors." Dean Milk Co. v. Madison, 340 U.S. 349, 71 S.Ct. 295, 95 L.Ed. 329 (1951). See also, Sheffield Farms Co. v. Seaman, 114 N.J.L. 455, 463 (Sup. Ct. 1935).
We recognize with some disappointment that the Commissioner of Health as a witness for the defendants was not invited to elucidate the relationship, if any, of this regulation to the protection of the public health. Moreover we collide with some undissolved perplexity in our endeavor to reconcile the preamble of the regulation which advertises that the necessity "to assure an adequate supply of milk for the inhabitants of this State" is the reason for the adoption of the requirement on July 5, 1950, and that portion of the communication of the Department of Health under date of August 18, 1950, which reveals:
"A review of the material submitted by you and of the records available in this office indicates that a sufficient supply of milk is still available to the consumers of New Jersey."
Applications for permits for plants located at Callicoon, Cazenovia, New Woodstock and Walton in the state of New York were thereby denied.
Thus, if the evidence of actualities ushers us to a point of view whether it is within the province of the Health Department to promulgate a regulatory requirement intended to spare the expense of inspections by the exclusion of milk supplies above those sufficient for the needs of our New Jersey consumers, we must resolve the question in the negative. Sheffield Farms Co. v. Seaman, supra; Urban v. Taylor, 14 N.J. Misc. R. 887 (Sup. Ct. 1936).
But in all its aspects, we cannot close our eyes to the fanlike breadth to which this elastic regulation may be expanded or contracted and the hit-or-miss characteristics of its resiliency. *313 The storage of milk is manifestly distinguishable from that of coal and fuel oil. We are told in one of the defendants' briefs that this regulation "will be operative naturally only in the short season" and that "the call plan may operate on any basis less than the 50%." (Emphasis ours.) This argument becomes somewhat feeble in view of the fact that the regulation itself does not express any such assurance. The why, when, if and where of its operations appear to rest upon the indeterminate vicissitudes which may inspire the triumvirate, unnamed in the regulation, to act. Thus the dealers' anticipated volume for the acquisition of which he customarily contracts in advance and his anticipated output for which he likewise contracts in advance are made subject to those mysterious and undefined contingencies.
This is said to be a plant problem, but in considerations of reasonableness we must realize that man's capacity to create confusion has, from the beginning of time, slightly outrun his capacity to cope with it. Dare we contemplate the consequences of the possible adoption of a similar regulation by our neighboring states?
We think it to be axiomatic that an exertion of the police power, affecting personal and property rights, is aside from other reasons nugatory unless made in good faith for the attainment of a public object within its cognizance. Lawton v. Steele, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894); New Jersey Used Car Trade Ass'n. v. Magee, 1 N.J. Super. 371 (Ch. Div. 1948). If the dominant purpose be to advantage economically certain private interests in the attire of the general public health, it must then be so regarded and defeated by the courts as an abuse of power. Reingold v. Harper, 6 N.J. 182, 192 (1951)
In our opinion, this administrative regulation is invalid.

II

LABELING REGULATION
"WHEREAS, There has been stated a need for distinguishing between milk produced in New Jersey and milk produced in other states,
*314 THEREFORE, Be It Resolved, that labels of all packages of milk sold for fluid consumption in New Jersey shall additionally show whether the contents were produced in New Jersey or from out-of-State sources."
It is asserted by the plaintiffs that this regulation and the others as well concerning which we shall presently comment are all noticeably armored with cactus-like spines to impede the approach of out-of-state milk. While the precepts now awaiting our further discussion are comparatively tame, yet in a panoramic view of all as they are marshalled in line before us, we discern a color of truth in those assertions.
Perhaps we should have previously stated that the invocation of all of these regulatory rules and directions was deferred by an order of the Appellate Division until the final determination of these proceedings; hence we do not have any evidence of actual experience resulting from their practical operation.
Pertinent to the labeling regulation we find in the evidence the following apprehensions and objections expressed by the plaintiffs:
"Q. Mr. Nathans, I have a few questions to ask on this labeling regulation. Will the labeling of out-of-State milk as such convey to consumers that milk produced out-of-State is not necessarily produced under conditions subject to New Jersey regulations or New Jersey official supervision? A. We believe it would.
Q. Would such labeling convey to consumers that milk produced out-of-State is not subject to the same sanitary regulations and under the same official supervision as milk produced in New Jersey? A. We believe it would.
Q. Would it indicate to consumers that such out-of-State milk so labeled is longer in transit, for example, than milk produced in New Jersey, to the detriment of out-of-State milk? A. We believe that would be the reaction, yes.
Q. Would you say that this would tend to cause milk consumers to refuse to purchase milk originating at out-of-State sources? A. We fear that, yes, sir.
Q. Do you believe it to be the case? A. Yes, we do."
The witness Rowe testified:
"Such a regulation would require that milk plants be equipped with sufficient raw milk storage capacity to keep the New Jersey *315 milk separate from the out-of-state milk. This would mean in some instances the purchase and installation of additional storage tanks, which items, incidentally, are expensive, about $6,000 or more, and at the present time are difficult to obtain due to the shortage of stainless steel.
Once having segregated the New Jersey milk from the out-of-state milk, plant operations would have to be changed to permit the pasteurizing, homogenizing and bottling of, first, milk from one source, and then from the other. Such change in operations would add to the presently existing problem of shutdowns and non-productive shutdown time.

* * * * * * * *
Well, to the extent that added shutdowns are involved, expanding the total amount of time required to process and turn out the output of the plant, and to the extent that added equipment in the line of storage tanks were required, adding to clean-up time, the expansion of time might well push your operation into a second shift, which, as I previously pointed out, is an undesirable thing if it can be avoided.
Q. Will that or will it not mean added expense to the operator of the milk plant? A. Inevitably it must mean added expense because anything that represents a greater amount of time constitutes dollars."
A manufacturer of caps and closures for glass milk bottles who produced (exhibit P-13) a sample cap or hood now in common use typifying the amount of printed matter thereon explained:
"In most cases we would have a little room to work in something like that, but I have given some thought to that and my concern with it is that in the space available that lettering would have to be so small that it would be very hard to read.

* * * * * * * *
Q. Do you use the same cap for the different sizes of bottles? A. No, sir.
Q. How many different sizes are there in habitual use at the present time? A. Four for our company.
Q. And if you had to set forth the legends which I have heretofore described, would that require four or eight new cylinders? A. Well, it would require new printing plates for every dairy and for every size."
But what about the utility of the requirement as a health measure? Dr. Kern expressed his opinion:
"I would say that it has no public health significance whatsoever; that the same regulations which we now maintain over out-of-State *316 supplies in our plants approved for New Jersey are the same as we maintain within the State, so the quality of milk would be equal and the safety would be just as equal."
An inquiry on that phase of the subject was addressed to the Senior Food and Drug Inspector:
"Will the enforcement of this rule aid or assist your Department to improve the purity or quality of milk or prevent disease? A. No sir."
It is said, however, that the housewife should know "the source of the food she purchases for the family." True, if the milk proves to be in an objectionable condition, the legend on the cap of the bottle will inform her that it was produced outside of New Jersey, but where outside? The same trail through the already existing records of out-of-state plants and producers must and can be pursued.
Appraising the propriety of using labels to prevent public deception, it must be reluctantly confessed that New Jersey milk has not yet attained the exceptional popularity of the Florida orange and the Idaho potato.
This unessential and burdensome requirement likewise displays its affinity to the resistance against interstate competition. Since all milk from whatever licensed sources must conform to the same standards of quality and purity, this discriminatory imposition does not appear to have any substantial, practical, or beneficial relation to the public health. Cf. Dean Milk Co. v. Aurora, 404 Ill. 331, 88 N.E.2d 827, 14 A.L.R.2d 98 (Sup. Ct. 1949).
We deem it to be invalid.

III

SHIPPING TAG REGULATION
"WHEREAS, It is necessary to trace shipments of milk to insure that only approved sources of milk are used for distribution and sale in New Jersey, and there is a break in the continuity of records of some shipments,
*317 WHEREFORE, Be It Resolved, that the shipping tag attached to, and the bill of lading accompanying each shipment of fluid milk moving into a plant approved by this Department shall specify the classification of the milk in transit."
This regulation requires the specification on the shipping tag and accompanying bill of lading of "the classification of the milk in transit." The use of the word "classification" seems to have generated criticism because of the ambiguity in its terminology in the milk industry. The basis of the objection seems to have been dissolved by the assurance of the Commissioner that the intent of this regulation was merely to emphasize the pre-existing practice and in no respect to alter the pre-existing regulations relative to the requisite designations to appear on shipping tags.
Judicial intervention at this time is not exigent.

IV

ADDITIONAL PRODUCER REGULATION
"WHEREAS, There is a constant shifting of producers from one plant to another, and some of these producers may have previously been delivering to plants not approved by this Department,
THEREFORE, Be It Resolved, that any plant holding a permit from this Department shall not engage additional producers until such producers' farms have been approved by the State Commissioner of Health."
Initially we notice that the preamble does not appear to be the vestibule leading to the interior of the resolution. The former alludes to unapproved plants, the latter to unapproved producers.
However, it is at once observable that this regulation pertains to the acknowledged right of the Department of Health to examine and approve the sources of the production of all milk to be sold for fluid consumption in the State of New Jersey. R.S. 24:10-11; Milk Control Board of Pennsylvania v. Eisenberg Farm Products Co., 306 U.S. 346, 59 S.Ct. 528, 83 L.Ed. 752 (1939); Aerated Products Co. v. *318 Department of Health of N.J., 59 F. Supp. 652 (Dist. Ct. 1945), affirmed 159 F.2d 851 (Ct. of A. 1947).
The regulation is impugned upon the grounds that it is not needed, that it is unwise, and that its authorship and literal composition is inexpressive. We have previously stated that where the measure adopted and invoked by a state department is within the field of its lawfully delegated authority and tends to serve a legitimate interest of society within the category of the department's vested authority, the need, wisdom and appropriateness of the means chosen to accommodate that public interest are not justiciable subjects unless the measure or its operation offends constitutional restraints or the rule of reasonableness.
In our consideration of the reasonable propriety of this regulation we are quite satisfied with the explanation of the Commissioner:
"Well, experience has shown that certain producers, sometimes called floaters, refuse to meet minimum sanitary standards as may be required, either by the plant to which they normally sell their product or by some health agency that determines whether or not the particular receiving plant may have a permit from the health jurisdiction. Such floater-producers may then arbitrarily decide to shift the location where they will sell their milk or they may find it necessary to do so because the first plant to which they had been selling their milk refuses to receive it any longer.
Knowing of that situation and recognizing that the addition of producer farms, which may in some instances be very large in size, involving hundreds of head of cattle, is in many respects something comparable to another plant; and we feel that it is our duty to protect the citizens of New Jersey in the fluid milk and other milk products which they consume.
Accordingly we cannot approve a plant and grant a permit under one set of conditions which exists at the time of our original inspection and decision to grant them a permit, and then have no control over what they do from that point on during the duration of the permit.
We were careful in wording the regulation to put in the word `approved,' not `inspected,' because we know through years of contact with some of these plants that they have a very high level of sanitation. Some of them have their own capable inspectors; some even have laboratory control features in their quality control program; and our inspectors, different at different times, have never been able *319 to find anything of any consequence wrong with either their producing farms or their transportation system of their operation in the plant.
We know that some of these plants have a very high reputation for quality product and we know that they would not accept any new producer who didn't meet their minimum standard, which might even be higher than ours. Accordingly, by using the word `approval' we would approach such an addition promptly, upon notice, without holding them up for a long period of time or wasting a lot of State money to go out and make a special inspection of some one dairy, in another State perhaps.
However, we also know of some others that do not maintain so high an average of sanitation and where we have a right, on the basis of past knowledge and judgment, experience, to doubt if a given new farm they may wish to add to their supply really meets the standard. In such a situation we feel that we must protect the citizens of the State and insist upon getting adequate evidence that the new producer is satisfactory before it is permitted to join the supply.
Actually, very bad milk from one farm, one large producing farm, could have a very deleterious effect upon the entire supply handled by that plant because the milk is mixed.
Q. Mixed?
A. Mixed at the plant."
The plaintiffs caution us that we cannot recognize the bent of the regulation from its physiognomy. It is suggested that this requirement is but another instrumentality of oppression; that pragmatically employed the investigations of the additional producers will be inordinately protracted and the approvals, if any, arbitrarily deferred. Such a suggestion has the characteristics of a satirical commentary. It is sustained by neither proof nor presumption.
"Well, in lots of instances," said Dr. Kern, Director of Quality Control of the Dairymen's League, "I'm afraid the producer would decide that he would go to a market where it wasn't necessary for him to wait for this inspection, because the other departments of health, like New York City and local markets which he might have available will take him on immediately."
We see that the Senior Food and Drug Inspector of the Health Department commends the purpose of the regulation but believes that it should be supplemented:
*320 "My opinion is that the intent is still good but that it should be reworded so that a time period in which to submit this information would be in effect.

* * * * * * * *
If we should set up a period of time such as a month from the time that the plant engages this producer, during which time the plant can obtain quality control reports on the milk as delivered by the producer, to supplement the inspection report and the veterinarian's certificate showing the health of the herd, we would be in a better position to pass on the producing farm."
To permit the introduction of fluid milk into our State even temporarily for domestic consumption without any official inquiry concerning the sanitary conditions of its source is essentially a matter of policy bearing a real and substantial relation to the public health, and in the determination of that question of policy we are not at liberty in the circumstances of the present case to nullify or supplant the judgment of the Health Commissioner.
We conceive this regulation to be reasonably adaptable to the protection of the public health and that on its face it is neither arbitrary nor inordinately oppressive in establishing the stated prerequisite. A remedy is always available if and when the regulation is arbitrarily or despotically administered.

V

THE MONTHLY MILK PLANT OPERATION REPORT
We are informed by the evidence that of the 539 permit holders, 248 are located outside of New Jersey. We must therefore appreciate that the local regulations and requirements of general application have their impact upon the sizeable fraction who supply us with milk through the avenues of interstate commerce. It is accordingly proposed that the relevant features of the regulation ought to be viewed with that orientation. Indeed, the plaintiffs in the action instituted by Dairy Dale Milk, Inc., and others (docket No. A-782-49) are all engaged exclusively in interstate commerce and assert their rights and privileges incident to that pursuit.
*321 Ordinarily administrative rules requiring the submission of periodical reports from licensees are regarded appropriately to be within the broad and liberal discretion of the licensing agency. Such discretion must nevertheless be exercised within the terminal borders of rationality.
The form of the report before us manifestly appertains principally to the quantity of milk and cream received and shipped by the plant during the monthly period. The items request the disclosure of the milk and cream inventory at the beginning of the month, and the quantity on hand at the end of the month, the quantity received from approved patrons and also from other sources, the quantity of milk used for separation to cream, the amount of cream thus derived, the cream used in manufactured products and the amount of milk and cream resulting from plant loss.
From a distant point of view it would be supposed that the volume of the business currently transacted by a milk plant would have relevancy to economic criteria rather than to those pertaining to sanitation.
An inquiry concerning this phase of the regulation was addressed to the Senior Inspector:
"Q. I direct your attention to Exhibit F attached to the petition of the petitioners, called Monthly Milk Plant Operation Report, and I ask you in what way, if any, will the data pertaining to classification of milk contained in Schedules 1, 2 and 3 required on that reporting form and which was attached to your letter of July 10, 1950, assist or aid your Department in administering or enforcing the State Food, Drug or Cosmetic Laws, and in particular Title 24, Chapter 10 of the Revised Statutes pertaining to milk? * * *
A. In no way, to my knowledge."
The correlation of this requirement to the 50 per cent command regulation, which we have declared invalid, is immediately discernible. Obviously, acquisition of the information sought to be elicited by this report was a necessary auxiliary to the enforcement of the 50 per cent requirement.
Here again we resort to the expediency of reproducing rather liberally some informative quotations from the testimony:
*322 "Q. What effect, if any, will compliance with this report have upon the operations of a multiple plant operator? A. It will encumber upon him a considerable increase in cost for accounting of milk and cream according to the requirements of this report, an accounting requirement which is not normally now done. It will therefore mean a new set of classifications and determinations, all of which would seem to have no direct benefit as far as the Department of Public Health is concerned in the determination of the receipts and dispositions of milk and cream at plants approved by the Department of Health of the State of New Jersey.

* * * * * * * *
If I am correct in that assumption, I would say that all of the information required here would merely be a duplication of information which is already submitted monthly, by the 20th of the month following the month in which the milk was received and handled, to the Office of Milk Industry of the State of New Jersey.

* * * * * * * *
In other words, this reporting requirement as such would appear to be so cumbersome with the classifications which I have described as to definitely discourage such operators from continuing to have their milk available for New Jersey.
Q. Now with respect to this report, assume the situation where a licensee out of the State furnishes a small portion of his milk to the State of New Jersey, would the entire extent of his operations for the balance of his milk which is not shipped into New Jersey be reflected in the information required under this report? A. That is correct, regardless of the area of disposition, whether it be Florida or California. All of the milk which does move into New Jersey is already covered on the reports of the handler to which the milk was shipped, in his report to the Office of Milk Industry."
Not impervious is the technique of adding to the otherwise mercantile report the two lonesome items: "21. Numbers of farms inspected by plant fieldman during month; 22. Date of last official sanitary inspection." Those unobjectionable inquiries whisper some consolation into the form of the report but do not have the cogency to sustain its proximity as a whole to considerations of public health.
The inference is inescapable that the anticipated serviceability of this report would inhere completely in its affiliation with the 50 per cent command requisition and that without association with the latter it is destitute of any materially useful basis. Thus the monthly preparation of such a report would be intemperately burdensome, especially *323 upon those out-of-state plant operators whose interstate shipments to New Jersey are during some seasons of the year relatively small. Assuredly any burdensome exaction of the Department of Health must appear to have some reasonable essentiality to the public health.
We conclude that this requirement amid the surrounding considerations is palpably unrelated to the preservation of the public health. Hence, it is determined to be invalid.
In pursuing our introspective examination of these regulations we have entertained the realization that the fluid milk industry is affected by factors peculiar to itself which call for special methods of adjustment and control. We have necessarily suppressed any sympathetic propensity to twist the proposed regulations either to the right or left in favor of one or the other of the divergent interests of producer or plant operator.
The scope of our supervisory jurisdiction is confined to subjecting the regulations to the test of the applicable principles of the established law.
Judgments declaratory of our conclusions may be entered.