31 N.J. Super. 267 (1954)
106 A.2d 350
JAMES P. SHERRY, PETITIONER-APPELLANT,
v.
CHESTER D. SCHOMP, DEPUTY DIRECTOR, OFFICE OF MILK INDUSTRY, ET AL., RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 1954.
Decided June 11, 1954.
*269 Before Judges CLAPP, FRANCIS and SCHETTINO.
Mr. Otto E. Riemenschneider argued the cause for petitioner-appellant and for intervenors Independent Milk Distributors Association and Independent Milk Sub-Dealers Association.
Mr. Joseph Lanigan, Deputy Attorney-General of New Jersey, argued the cause for respondent Office of Milk Industry.
Mr. Thomas L. Parsonnet argued the cause for intervenor Milk Drivers and Dairy Employees, Local 680 (Messrs. Parsonnet, Weitzman & Oransky, attorneys).
The opinion of the court was delivered by SCHETTINO, J.S.C. (temporarily assigned).
Appellant James P. Sherry appealed from a judgment of the Office of Milk Industry imposing a fine of $50 plus costs for violation of Regulation F-26 promulgated by that office. Subsequently this regulation was brought directly before this court for further proceedings for review of its validity. Several interested groups were permitted to intervene. Additional testimony was taken by order of this court.
At the outset we must comment upon the attempted imposition of a fine. We find no statute purporting to authorize the agency to take such judicial action. The Milk Control Act of 1941 (L. 1941, c. 274; N.J.S.A. 4:12A-1 et seq.) provides for penalties for violation of regulations of the director to be enforced by proceedings in specified courts. N.J.S.A. 4:12A-39 and 41. Although the Director is empowered to hold informal hearings upon violations "and upon finding the violations to have been committed, to adjust the same with any person accused * * * for such amounts as may in the discretion of the director, be proper under the circumstances," N.J.S.A. 4:12A-43, he is powerless to impose a fine upon a contesting licensee. Authority *270 to revoke licenses does exist under N.J.S.A. 4:12A-35 for grounds stated therein; and in fact the proceedings against appellant began by complaint and order to show cause why his license should not be revoked, but somehow the judgment took the form we have described. The judgment being without authority, it must be set aside. However, since the validity of the regulation must ultimately be determined, we shall deal with that issue.
Regulation F-26 reads in part:
"In Milk Marketing Areas 3 and 4, the boundaries of which are fixed by the Office of Milk Industry, there exists certain labor contracts which bind part of the industry to hours of delivery. In order that there shall be no unjust or demoralizing practices regarding the delivery of milk in Areas 3 and 4, it is hereby regulated:
A. That any licensee of the Office of Milk Industry delivering milk in Marketing Areas 3 and 4 shall not deliver any milk retail for home consumption except between the hours of 5:30 A.M. and 6 P.M. of any day during the months of May, June, July, August and September and except between the hours of 6 A.M. and 6 P.M. during the months of October, November, December, January, February, March and April; and provided that deliveries made or caused to be made on Sundays and legal holidays not more than two hours prior to 5:30 A.M. shall not be deemed in violation of this regulation.
B. Any licensee of the Office of Milk Industry delivering milk in Marketing Areas 3 and 4 shall not deliver any milk wholesale intended for resale or consumption off the premises of said wholesale place of business except between the hours of 5:30 A.M. and 6 P.M. of any day during the months of May, June, July, August and September and except between the hours of 6 A.M. and 6 P.M. during the months of October, November, December, January, February, March and April; and provided that deliveries made or caused to be made on Sundays and legal holidays not more than two hours prior to 5:30 A.M. shall not be deemed in violation of this regulation.
C. That any licensee of the Office of Milk Industry shall not deliver any milk to a wholesale place of business for consumption on the premises except between the hours of 2 A.M. and 2 P.M. of any day, except that delivery may be made on Saturday after 2 P.M. in those cases where no Sunday delivery is made.
D. In cases where this regulation works a hardship in Marketing Areas 3 and 4 on a government agency or a hospital, application for relief may be made in writing to the Director and the application shall state the reasons for the request for relief from the provisions of this regulation and if the Director deems the reasons satisfactory, he may grant relief from the terms of this regulation."
*271 There are five marketing areas prescribed by the Director. Area 3 embraces parts of Monmouth and Ocean Counties; Area 4 embraces Bergen, Passaic, Essex, Hudson, Union, Morris, Somerset, and Middlesex Counties. The regulation is attacked as being beyond statutory authority, arbitrary, discriminatory and violative of substantive due process of law.
N.J.S.A. 4:12A-21 reads:
"The director may fix the price at which milk is to be bought, sold, or distributed; regulate conditions and terms of sale; establish and require observance of fair trade practices; supervise, regulate and control the entire milk industry of the State of New Jersey, including the production, importation, classification, processing, transportation, disposal, sale or resale, storage or distribution of milk as defined in this act in the State of New Jersey in those matters and in every way necessary to carry out the purposes of this act and necessary to control or prevent unfair, unjust, destructive or demoralizing practices which are likely to result in the demoralization of agricultural interest in this State engaged in the production of milk or interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State; provided, however, that nothing contained in this act shall be construed as authorizing the director to adopt, promulgate or enforce orders, rules or regulations containing provisions or sanitary regulations as defined in section one of this act; and provided, further, that nothing contained in this act or orders, rules or regulations adopted thereunder shall conflict with or be construed to abrogate or affect the status, force or operation of any public health law, any sanitary regulation or any local health ordinance, code or regulation, or Title 24 of the Revised Statutes and amendments thereof and supplements thereto."
N.J.S.A. 4:12A-28, dealing with licensure, provides in part:
"The licenses required by this act are for the purpose of correcting unfair, unjust, destructive and demoralizing practices in the milk industry in this State, and to prevent demoralization of agricultural interests engaged in the production of milk in this State."
N.J.S.A. 4:12A-35, dealing with refusal, suspension, and revocation of licenses, provides for such action for violation of a regulation and also for "any act injurious to *272 trade or commerce, or any act which may demoralize the price structure of milk or interfere with an ample supply of milk for the inhabitants of this State."
The history of milk control legislation has recently been recounted by Mr. Justice Jacobs and need not be repeated here. Abbotts Dairies, Inc., v. Armstrong, 14 N.J. 319 (1954). The constitutionality of the standards for legislative action of the Director has been adjudged. Como Farms, Inc. v. Foran, 6 N.J. Super. 306 (App. Div. 1950). The statute, however, does not furnish a definition of such terms as "fair trade practices" and "unfair, unjust, destructive or demoralizing practices which are likely to result in the demoralization of agricultural interest in this State engaged in the production of milk or interfere with the maintenance of a fresh, wholesome supply of sanitary milk for the consumers of this State," contained in N.J.S.A. 4:12A-21, or "unfair, unjust, destructive and demoralizing practices' in the milk industry in this State" or "demoralization of agricultural interests engaged in the production of milk in this State" contained in N.J.S.A. 4:12A-28.
The principal problem here presented is the interpretation of the will of the Legislature embodied in the quoted provisions. The reasonableness of a regulation is rebuttably presumed if it comes within the ambit of delegated authority, State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504, 523 (E. & A. 1935), but this presumption is of no help in ascertaining that ambit. The Office of Milk Industry has no powers except the ones given to it by statute. In In re Port Murray Dairy Co., 6 N.J. Super. 285 (App. Div. 1950) this court adopted the view that the powers of this administrative agency will be more liberally construed than under earlier approaches to the powers of such agencies, but added that yet "it remains true that the agency will not be considered to have power to curtail drastically important rights of the citizen, whether as regards person or property, unless the legislative intention to grant such power is plainly manifest." (p. 302.)
*273 What are the objectives of the statute and what is the relation between those objectives and the prescription of the hours of delivery in the challenged regulation? The primary objective of the statute appears to be to insure a return to the farmer which will support a constant flow of wholesale milk to consumer. Abbotts Dairies, Inc. v. Armstrong, supra (14 N.J., at p. 330); State Board of Milk Control v. Newark Milk Co., supra (118 N.J. Eq., at p. 521). The unfair, unjust, destructive and demoralizing practices referred to in the statute are practices of such character as relate to this primary objective. In one sense, by reason of interdependence of things in an integrated society, remote connections can be found by attenuated expositions of cause and effect; but some degree of immediacy must exist if statutory powers of the kind here involved are not to become sprawling grants of authority. For example, the price which the farmer pays for feed or for help may be argued to be so connected with the primary object of the statute that differentials in such costs bear upon the achievement of the legislative aim. Yet, we doubt that anyone would suggest that the existence of such differentials can be prescribed by the Office of Milk Industry on the hypothesis that they are unfair, unjust or demoralizing. The agency is authorized to fix the price of milk, but that authority does not embrace power to deal directly with every underlying factor which operates to influence cost of production, transportation or disposal of the product.
The regulation in question is not required to be supported by express findings of fact. Garden State Farms, Inc. v. Armstrong, 31 N.J. Super. 61 (App. Div., decided May 28, 1954). The Director offered no testimony as to the considerations which motivated the regulation. We have before us, as far as the Director is concerned, the following statement in the regulation which we repeat:
"In Milk Marketing Areas 3 and 4, the boundaries of which are fixed by the Office of Milk Industry, there exists certain labor contracts which bind part of the industry to hours of delivery. In *274 order that there shall be no unjust or demoralizing practices regarding the delivery of milk in Areas 3 and 4, * * *."
We gather that the Director believed that departure from provisions of "certain labor contracts which bind part of the industry to hours of delivery" would constitute "unjust or demoralizing practices" within the marketing areas to which those contracts apply.
The union which holds those contracts vigorously supports the regulation upon the testimony which it offered. We are thus informed that during the negotiations for a renewal of a contract which was to expire October 24, 1951 the union demanded a clause giving it and its members the right to refuse to deliver milk to any dealer or sub-dealer who made deliveries prior to the delivery time specified in chapter 294, Laws of 1945, or in the contract; that the employers refused to agree to this demand and the first general strike in the milk industry in New York and New Jersey since 1921 thereupon ensued; that the dispute was settled "through what might be called a tripartite agreement" whereby (1) the Union agreed to an earlier starting time, provided the law be modified to permit this, (2) the State of New Jersey agreed to enforce the policy of daylight delivery through the Office of Milk Industry by regulation, and (3) the employers agreed that if there were no effective regulation by this agency by May 1, 1952, they would agree to the union's original demand; that chapter 294 was thereafter repealed by chapter 77, Laws of 1952, to which was attached the following statement:
"This bill is made necessary due to the fact that both the milk industry and labor have agreed that the present law works inequities in many instances. Both the industry and the unions have agreed that it would be more efficacious to permit the Office of Milk Industry in the Department of Agriculture to make regulations dealing with the time at which milk can be delivered. The Office of Milk Industry, however, cannot make regulations as long as Chapter 294 of the Laws of 1945 remains on the statute books.";
and that the regulation in question then followed.
*275 We will return presently to the effect, if any, which can be given to the statement accompanying the bill which became chapter 77. Preliminarily we must first determine whether the Milk Control Act of 1941 authorized the agency to adopt the regulation in question and the correctness of the hypothesis that such power existed but for the 1945 law.
The union urges that a strike would impair a constant flow of wholesome milk to consumers and the financial return to the producer. Obviously that is true, but it does not follow that the Office of Milk Industry was vested with power to determine labor controversies. There is no field in which the Legislature has been more loath to resort to compulsion than in the resolution of labor disputes. A court cannot concern itself with the wisdom of a legislative decision in that arena but rather must confine itself to such constitutional issues as statutes of that kind may involve. Cf. New Jersey Bell Telephone Co. v. Communications Workers, etc., 5 N.J. 354 (1950). But in the light of the history of labor relations, a court cannot lightly assume a legislative grant of that unusual power. If the position of the union that the imminence of a strike justifies a regulation which would avoid it is sound, it would follow that the Office of Milk Industry could legislate with respect to all matters of hours, pay and working conditions which have heretofore been treated as matters for collective bargaining, and this upon standards which are not addressed to legislative regulations upon the subject of labor relations.
Nor can that authority be found to have been granted by chapter 77 of the Laws of 1952. We are not unwilling to note the quoted statement of purpose, but it cannot serve to read into the statute something which is not there. The act is a mere repealer. We cannot assume that the legislators who voted for it were motivated by the recitals in the statement. On the contrary they, or some of them, may have disapproved the prior statutory regulation of hours of delivery. Nor can the repealer be deemed to constitute a legislative interpretation of the scope of the *276 power delegated by the Milk Control Act of 1941, both for the reason just given and for the further reason that the interpretation of a statute is exclusively a matter for the judiciary.
Can there be a legally efficient relationship between hours of delivery and the statutory objective described above? We cannot answer this question categorically. Much would depend upon the facts in any given situation. Several considerations are advanced in the briefs in support of the regulation beyond the consideration discussed at length above. But the record presented as to them fails to provide any substantial legal justification for the measure. In any event, had the agency grounded its regulation upon those further considerations, the issue might have more vitality, but we have no way of knowing that the agency would regard any of them as sufficient for the exercise of its claimed authority. It is true, as stated above, that the reasonableness of a regulation is presumed if within the scope of the delegated power. Yet, when a regulation on its face shows that it was made in pursuit of a purpose not authorized, (see Welsh Farms, Inc. v. Bergsma, 16 N.J. Super. 295, 306 (App. Div. 1951)), to wit, to resolve a source of difference between employer and employee with respect to hours of work by making standard within the mentioned marketing areas that practice upon which a part of the industry has agreed by labor contracts, it would carry the presumption too far to presume that the agency was prompted by factors which might establish a power to act, that is, the existence of a proper basis between the means and the statutory objective, and perhaps thus to sustain the regulation upon a basis which the agency itself might have rejected. Moreover, the issue ultimately is one of jurisdiction to act, rather than the reasonableness of action taken within an established jurisdiction, and it is at least doubtful that resort may be had to a presumption to resolve that jurisdictional question. Cf. 42 Am. Jur., Public Administrative Law, sec. 240, p. 680.
The regulation is invalid. The judgment is reversed.