31 N.J. Super. 61 (1954)
105 A.2d 884
GARDEN STATE FARMS, INC., A CORPORATION OF NEW JERSEY, ET ALS., PLAINTIFFS-APPELLANTS,
v.
C. WESLEY ARMSTRONG, JR., DIRECTOR OF OFFICE OF MILK INDUSTRY, DEPARTMENT OF AGRICULTURE, STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 19, 1953.
Decided May 28, 1954.
*65 Before Judges CLAPP, GOLDMANN and EWART.
Mr. Nicholas Martini argued the cause for appellants.
Mr. Joseph Lanigan, Deputy Attorney General, argued the cause for respondent (Mr. Theodore D. Parsons, Attorney General).
The opinion of the court was delivered by EWART, J.A.D.
Plaintiffs, 35 in number, most of whom are processors (wholesalers) of milk and milk products and the remainder of whom are subdealers (retailers) of milk products, being aggrieved by the provisions of paragraph three of Regulation F-31 promulgated April 16, 1953 (and to be effective May 1, 1953) by the Director of the Office of Milk Industry, Department of Agriculture, appeal to this court for a judicial review of paragraph three of said Regulation F-31, pursuant to the provisions of R.S. 4:1-34 and R.R. 4:88-8 et seq.
The regulation in question reads as follows:
 " STATE OF NEW JERSEY
 before
 C. WESLEY ARMSTRONG, JR.
 Regulation F-31
In order to simplify the discount regulation on sales by Processors to Subdealers, we are continuing those presently in effect in this regulation.
1. A subdealer who uses his own cases and bottles may be allowed a discount of 1/4c per quart by the dealer or processor for the use of bottles and cases. Pints, half-pints, or other type container must *66 be converted into quarts. Where the dealer furnishes the bottles, a bottle deposit of $.03 each shall be charged, and where a container box is furnished, 50c shall be charged for each box. Caps are to be furnished by the dealer.
2. Discounts allowed on volume purchases shall be determined on the average daily purchases for each week. Such discounts may only be allowed a sub-dealer who purchases quantities in accordance with the aforesaid schedule. This schedule of prices may become applicable to a subdealer who, by actual purchase, acquires the business of another subdealer, thereby increasing his volume of business to conform to the above schedule.
3. If a subdealer or dealer transports or arranges for the transportation of the milk which he purchases from a dealer's or processor's depot, bottling or processing plant, to his plant or distributing point, including return of empty bottles and cases, the actual cost of cartage may be deducted from the prices as fixed by the Director. This cost is to be credited to the subdealer's account by the dealer or processor upon the presentation of receipts covering the cartage, and in no case shall the deductions exceed the following schedule: 

 From plant or Up to 6 miles None
 depot to distribution 6 miles and up to 11 miles 1/4c
 point, 11 " " " " 26 " 1/2c
 one way 26 " " " " 51 " 3/4c
 51 " and over 1c

Computations are to be made on the basis of quarts; pints, half-pints or other type containers must be converted into quart equivalent.
In the application of the above schedule of deductions, the distance shall be that which exists by the most direct route between the subdealer's plant or central distributing point (address listed on license) and the processor's or dealer's nearest depot or bottling or processing plant.
This regulation shall take effect at 12:01 A.M., Eastern Daylight Saving Time, Friday, May 1, 1953.
 /s/ C. Wesley Armstrong, Jr.
 C. WESLEY ARMSTRONG, JR., DIRECTOR
 Office of Milk Industry
 Department of Agriculture
 State of New Jersey
 Dated: April 16, 1953"
Under date of May 5, 1953, 24 of the processors (wholesalers) affected by the regulation, and all of whom are located in the metropolitan section of North Jersey, filed a petition with the Director in which they sought to have him amend paragraph three of the regulation in question so as to permit the allowance of "cartage" costs at the rate of 1/4 of 1¢ per quart to all subdealers (retailers) located within 11 miles of *67 the processor's plant or depot, that is, to all subdealers who call at the processor's plant or depot to pick up and transport their milk. The petition alleges that paragraph three of the regulation as written and which disallows "cartage" credits to subdealers located within six miles of the processing plant is unreasonable and unnecessary, would be harmful to the processing plant, and would cause substantial losses to the processors. The petition was followed by a letter written by the attorney for the plaintiffs to the Director under date of May 11, 1953 urging the same amendment to the regulation as set forth in the petition, and elaborating somewhat on the reasons therefor, and a letter from the Director to the said attorney under date of June 4, 1953 refusing to amend paragraph three of the regulation as requested.
Notice of appeal to the Appellate Division of this court, seeking a judicial review of paragraph three of Regulation F-31, was served and filed April 24, 1953; on notice an order was entered in this court May 18, 1953 granting plaintiffs leave to take testimony and produce evidence before the Director in support of the appeal; and a further consent order was entered June 16, 1953 extending the time for the taking of proofs until July 15, 1953.
In pursuance of said orders, proofs were taken before the Director of the Office of Milk Industry at Trenton on June 24 and June 30, 1953. Sixteen witnesses were called by the plaintiffs and seven by the defendant; ten exhibits were offered and marked for the plaintiffs, and five exhibits for the defendant.
Of plaintiffs' 16 witnesses who testified at said hearings, eight are processors (wholesalers) of milk, five are subdealers (retailers), including Mr. Salvatore Mayor, who is president of the Independent Milk Distributors Association with 200 members for whom he spoke, and including Martin Winkler, who is president of the Bergen-Passaic Milk Distributors Association having 78 members for whom he spoke; and, in addition thereto, Dr. Charles P. Messick, a consultant in personnel and management, and two of his associates also testified for the plaintiffs.
*68 Of the defendant's seven witnesses, two are inspectors in the employ of the Office of Milk Industry, and five are executives of processing companies, most or all of whom are located in so-called country districts and not in the metropolitan area.
The proofs taken before the Director at Trenton on June 24 and June 30, 1953 support the factual conclusions set forth in the numbered paragraphs following:
(1) More than 50% of the subdealers in the metropolitan area of North Jersey reside within six miles of the processors' plants or depots from which they obtain milk and milk products for sale and distribution at retail.
(2) Prior to May 1, 1953, the effective date of the regulation, the great majority of the processors in the metropolitan area of North Jersey had theretofore allowed the subdealers who call at the procesor's plant and load up and cart away the milk, a so-called "cartage" allowance for each quart of milk purchased by the subdealer, the amount of the allowance being based in part upon the distance from the processor's plant to the place of residence of the subdealer. However, for the shortest distances the minimum rate of allowance seems to have been 1/3 of 1¢ per quart. That practice was wide-spread and almost uniform from the inception of milk control in 1933 up to May 1, 1953, except for a portion of the year 1948 during which Regulation F-11 was in effect, and included an allowance for cartage to subdealers who were located within six miles of the processor's plant or depot.
(3) The 24 processors who signed the petition above mentioned, seeking an amendment of paragraph three of the regulation, constitute about one-third of the milk processors in the North Jersey district and together process and sell about 500,000 quarts of milk per day on the average.
(4) The so-called "cartage" allowance to subdealers for carting away the milk from the processor's plant is based upon more than mere cartage for a given distance. It involves both time and labor furnished by the subdealer as well as transportation. The subdealer who drives his truck to the processor's plant to pick up the milk usually drives through congested traffic in the metropolitan area; he first unloads his empty *69 bottles at one platform and on occasion must wait in line for his opportunity to unload; he then takes his truck to another loading platform where he obtains his day's supply of milk and on occasion may have to wait in line behind other trucks ahead of him; the processor places the milk on the platform, but the subdealer has to perform the labor of loading the milk from the platform on to the subdealer's truck; the truck then proceeds to another platform where the milk, loaded in cases on the truck, must be iced so as to maintain the proper temperature until delivery may be made to the individual consumers. The proofs showed considerable variation in the time required for the subdealer to go through this operation and obtain his daily supply of milk, exclusive of the time of actual transportation. An executive of Garden State Farms, Inc., a processor serving something over 70 subdealers, testified that the average time spent by the subdealer at the plant getting his milk would run from 30 minutes to one hour. An executive of North Jersey Dairyland, Inc., a processor serving some 45 subdealers, estimated the time required each day by the subdealer to obtain his load of milk, iced, ready for delivery, would run from three-quarters of an hour to one hour. An executive of International Milk Company, a processor serving 26 subdealers, made a survey at his plant on June 8, 1953 of the time required for the subdealer to get his supply of milk and to get away from the plant and found the time consumed ran from 10 to 55 minutes for each subdealer. Dr. Messick and his associates made a survey at Sunrise Dairy, processors, on June 12 and June 13 and found the time required by a subdealer to get his milk from the processor and to get away from the processor's plant averaged 32.8 and 30.8 minutes per subdealer on the respective days. And another survey made by Dr. Messick and his associates at Garden State Farms on June 8 and 9, 1953 showed that it required on the average 51.2 minutes and 38.1 minutes from the time the subdealer arrived at the processor's plant until he was loaded and ready to leave on the respective days. Eight plants in all were surveyed by Dr. Messick and his associates with the result that the time required at the processor's plant by the subdealers, in addtion to *70 the two processing plants above mentioned, ran from a low of 18.1 minutes to as much as 51.2 minutes, and the mean time required by some 327 subdealers in getting their milk at the eight processors' plants and getting away was 31.2 minutes. On the other hand, surveys made by investigators of the Office of Milk Industry showed somewhat lesser time required for these operations. A survey by them at the Garden State Dairy on May 28 showed an average loading time of from 6 to 10 minutes per subdealer and another survey made by the investigators at Sunrise Dairy on May 28 showed the time required in loading up milk for the subdealers ran from 5 to 18 minutes and averaged 8.4 minutes. However, it would appear that the surveys made by the investigators on May 28 included only the time in loading the milk at the platform and did not include waiting periods to get to the platform, nor time consumed in unloading empty bottles, nor time consumed in icing the milk. Another survey made by the investigators on June 1 at Garden State Farms showed the whole operation from the time the subdealer arrived at the plant until he was ready to leave ran from 14 to 51 minutes and averaged 38.8 minutes, and another survey made by them at Sunrise Dairy on June 1, 1953 showed that the time consumed ran from 5 to 15 minutes and to have averaged 7.4 minutes. And another check made by the said investigators on May 29, 1953 at North Jersey Dairyland showed the time required by each subdealer to get his milk and get away ran from 8 to 29 minutes and averaged from 10 to 12 minutes.
In any event, we think the evidence supports the conclusion that the "cartage" allowance to subdealers who go to the processor's plant for the milk actually covers more than mere transportation. It also involves both time spent and labor furnished by the subdealer at the plant in the operation of unloading empty bottles, loading up his daily supply of milk on his truck at one platform, getting his milk iced at another platform, and in some instances time consumed in waiting the opportunity to get to the platforms for the unloading and loading operations. Time spent and work furnished by the subdealer *71 at the processor's plant is the same whether the subdealer resides more or less than six miles from the plant.
(5) Subdealers who continue to purchase milk from the processors located within six miles of the subdealers' residence under paragraph three of said regulation, disallowing "cartage" credits to such subdealers, would suffer a loss ranging from $12 to $40 per week for each subdealer.
(6) Subdealers residing within six miles of the processor's plant from whom they purchase milk could avoid the loss of "cartage" credits under said Regulation by purchasing their milk from processors more than six miles distant from the subdealer's residence. To avoid the loss of such business (and the proofs show that more than 50% of the subdealers in the metropolitan North Jersey area reside less than six miles from the processor's plants), the processors might be compelled to deliver milk to their subdealers. In a great many instances that would involve the purchase by the processor of delivery trucks and other equipment and the hiring of additional labor and would increase substantially the operating costs of the processor. The testimony given supports the conclusion that it would cost the processor on the average 3/4 of 1¢ per quart to deliver milk to the subdealers resident within six miles of the processor's plant (as against the subdealers' willingness to cart their own milk for a "cartage" allowance of 1/4 of 1¢ per quart). Garden State Farms, with some 70 subdealers, estimate that it would cost them $30,000 per year to deliver milk to their subdealers; North Jersey Dairyland, with 45 subdealers, estimate they would have to invest $50,000 in trucks and delivery equipment; Knorr's Dairy Products Co., with 33 subdealers, estimate their annual cost of operation would be increased from $20,000 to $30,000 to make delivery to subdealers; International Milk Company, with 26 subdealers, estimate they would have to invest at least $12,000 in the purchase of trucks and that their operating cost would be increased by $13,000 per annum; Cisco Dairy Farms, with 52 subdealers, estimate they would have to purchase at least 4 delivery trucks and that they would have to make an additional capital investment for trucks and equipment *72 of at least $40,000; and Sunrise Dairy estimate their additional costs, if they are compelled to make delivery to subdealers, at $40,000 per annum.
These additional costs, the plaintiffs claim, would ultimately have to be passed on to the individual consumers.
(7) No public hearings were conducted, no proofs were taken, and no findings of fact were made by the Director prior to the promulgation of Regulation F-31 on April 16, 1953.
All of the processors and subdealers who testified for the plaintiffs claim that paragraph three of Regulation F-31, insofar as it disallows "cartage" to subdealers within six miles of the processors' plants, is unreasonable, arbitrary, and discriminatory; they assert that there is little difference in cost to the subdealer in transporting the milk five miles from the processor's plant (within which distance no "cartage" allowance is permitted) or in transporting it ten miles from the processor's plant (for which distance a "cartage" allowance of 1/4 of 1¢ per quart is permitted); that the real basis for the allowance of "cartage" credits is the time spent and labor performed by the subdealer between the time he arrives at the processor's plant and the time he is able to leave with his milk; and that the regulation unreasonably discriminates against the subdealer residing within six miles of the processor's plant.
On the other hand, Seymour Hayman, an executive of Middletown Milk and Cream Co. with main offices at Yonkers, New York; Edward D. Waldron, vice-president of B.R. Waldron and Sons Co. of Califon, N.J.; Aaron Halprin, president of Port Murray Dairy Company at Port Murray, N.J.; and Harold A. Stoller, treasurer of Puritan Dairy and Supreme Milk and Cream Co. of Perth Amboy, N.J., speaking for the processors represented by them, all contended that paragraph three of Regulation F-31, as promulgated April 16, 1953, is fair and equitable in that it tends to equalize costs to all subdealers operating under similar conditions; that if the subdealer chooses to avail himself of the facilities of the processor's plant by calling for his milk, rather than having it delivered to him, that is his privilege; and that the *73 convenience to the subdealer located near the processing plant in picking up his milk at the plant should eliminate any price consideration, or "cartage" allowance to such subdealer. These four firms last mentioned are so-called country processors, as contrasted with the plaintiffs who are so-called city processors located in the metropolitan area. It appeared that Mr. Hayman's company had never allowed "cartage" to subdealers within six miles of their plant, even before the promulgation of Regulation F-31 and that his company only has five or six subdealers within the six-mile radius. Mr. Waldron's company, it appears, has only three or four subdealers located within six miles of its processing plant. Mr. Halprin's company serves about 125 subdealers, of whom only four are located within six miles of the processing plant, and Puritan Dairy and Supreme Milk and Cream Company of Perth Amboy, for whom Mr. Stoller spoke, serves 50 to 55 subdealers, of whom only five or six are located within six miles of that company's processing plant. Thus it would appear that these four processors last mentioned hardly have the same problem with respect to dealers located within six miles of their respective plants as do the plaintiffs in the more thickly populated areas, most of whose subdealers are located within six miles of their respective processing plants.
On this appeal plaintiffs contend that paragraph three of Regulation F-31 is invalid for the reasons that (1) it prejudices the substantial property rights of the plaintiffs and is contrary to their constitutional rights prescribed by Art. I, par. 1 of the New Jersey Constitution of 1947, and of sec. 1 of the 14th Amendment to the Federal Constitution; (2) the portion of the regulation objected to is beyond the statutory authority of the Director; (3) the regulation lacks support by substantial evidence justifying it; (4) it is arbitrary, unreasonable, capricious and discriminatory; and (5) it violates the statute, R.S. 4:1-38.
Defendant contends that (1) paragraph three of the regulation is not a price-fixing order; that it is merely a regulation authorizing a transportation discount or cartage allowance in certain cases; and that the Office of Milk Industry, an administrative *74 agency, is under no obligation to conduct a public hearing or to make findings of fact to support such a regulation; (2) the Legislature possesses power to regulate and control the milk industry and has conferred upon the Agency the power to make and promulgate necessary rules and regulations; (3) there is substantial evidence adduced at the hearing that supports the reasonableness of the regulation in question; (4) and that the plaintiffs' proofs are insufficient to support the plaintiffs' burden of showing that the regulation is in anywise arbitrary, unreasonable, discriminatory or capricious.
The Milk Control Act of 1941 (L. 1941, c. 274  R.S. 4:12A-1 et seq.), as modified by the Department of Agriculture Act of 1948 (L. 1948, c. 447  R.S. 4:1-24 et seq.) undertakes to regulate and control the production, distribution and sale of milk and delegates broad powers of administration to the Office of Milk Industry created by the latter act and to the Director of that Office.
That the production, transportation, processing, distribution, sale and consumption of milk is affected with a public interest because it so vitally affects the health and welfare of the people and is, therefore, a proper subject for legislative action and regulation is no longer open to question. Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Borden's Farm Products Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934); State Board of Milk Control v. Newark Milk Co., 118 N.J. Eq. 504 (E. & A. 1935); Como Farms, Inc., v. Foran, 6 N.J. Super. 306 (App. Div. 1950). And the Milk Control Act of 1941, as modified by the 1948 act above mentioned, has been held not violative of the Constitution. Como Farms, Inc., v. Foran, supra.
The statutes in question delegate very broad administrative powers to the Director. He is authorized to issue orders, rules and regulations to carry out the objects and provisions of the Act, R.S. 4:12A-7; to adopt, promulgate and enforce all rules, regulations and orders necessary to carry out the provisions of the act, but all orders and determinations of the *75 Director shall include the findings of fact upon which such orders or determinations are based, R.S. 4:12A-20; to fix the price at which milk may be bought, sold or distributed, to regulate the conditions and terms of sale, to establish and require observance of fair trade practices, and to supervise, regulate and control the entire milk industry of this State, including the production, importation, classification, processing, transportation, disposal, sale or resale, storage or distribution of milk, subject, however, to certain limitations upon the Director regarding sanitary and health regulations, R.S. 4:12A-21, provided, however, before fixing prices he is required to give notice by public advertisement inserted in at least three daily newspapers and to conduct a public hearing and to make and issue findings of fact in support of such price-fixing orders, R.S. 4:12A-23; and in order to effectuate the orderly sale and distribution of milk between dealers, processors, subdealers and stores, and to carry out the provisions of the act, he is further empowered to promulgate and enforce conditions, terms and credit regulations governing such sales, R.S. 4:12A-26.
There is no constitutional prohibition against the delegation of a large measure of discretionary authority to an administrative agent for the administration of a statute enacted pursuant to the police power of the State, provided the statute establish a sufficiently basic standard and a definite and certain policy and rule of action for the guidance of such agent. State Board of Milk Control v. Newark Milk Co., supra; National Dairy Products Co. v. Milk Control Board, 133 N.J.L. 491 (Sup. Ct. 1945); Public Service, etc., Co. v. State, 5 N.J. 196 (1950). The delegation of administrative powers to the Director of the Office of Milk Industry by the statutes in question was sustained in Como Farms, Inc., v. Foran, supra.
There is a rebuttable presumption in favor of the validity of findings of fact and of orders and regulations issued by an administrative agent or agency. State Board of Milk Control v. Newark Milk Co., supra; National Dairy Products Co. v. Milk Control Board, supra; Welsh Farms, Inc. v. *76 Bergsma, 16 N.J. Super. 295 (App. Div. 1951); In re New Jersey Power & Light Co., 9 N.J. 498 (1952). However, an administrative agent such as the Director of the Office of Milk Industry is a creature of the statute; has no powers except those given by the statute; and will not be considered to have power to drastically curtail important personal or property rights unless the legislative intention to grant such power is plainly manifest. In re Port Murray Dairy Co., 6 N.J. Super. 285 (App. Div. 1949). Furthermore, the exercise by an administrative agent of police power affecting personal or property rights is valid only when made in good faith for the attainment of a public object within the cognizance of such agent (Welsh Farms, Inc. v. Bergsma, supra); the exercise of such power is subject to judicial superintendency if it be confiscatory and violative of property rights (National Dairy Products Co. v. Milk Control Board, supra), and if it constitute an arbitrary, discriminatory or unreasonable interference with personal or property rights, it is void as being in violation of the due process clause of the Federal Constitution (Nebbia v. New York, supra; Independent Dairymen's Association v. City and County of Denver, 142 F.2d 940 (10 Cir., 1944); Sperry & Hutchinson Co. v. Margetts, 25 N.J. Super. 568 (Ch. Div. 1953)). And the statute (R.S. 4:1-38) authorizes the court, upon review of the whole record, to suspend, reverse, vacate or modify the rule, order, decision or determination of the Director if the substantial rights of the appellant have been prejudiced as the result of the Director's rule, order, decision or determination being (1) contrary to constitutional rights or privileges; (2) in excess of the statutory authority of the Director; (3) affected by other error of law; (4) made or promulgated upon unlawful procedure; (5) unsupported by substantial evidence in view of the entire record; or (6) arbitrary or capricious.
The section of the statute cited merely enumerates the authority the court would have in any event.
After a consideration of the whole record, we are of the opinion that paragraph three of Regulation F-31, promulgated *77 by the Director on April 16, 1953, does prejudice substantial property rights of both the processors and the subdealers for the reasons set forth above. It would probably involve the processors either in a substantial loss of business from the subdealers located within six miles of the plant of the processor or the necessity of making very substantial capital investments for trucks and delivery equipment to enable them to deliver milk to the subdealers and, if the latter course were adopted, their cost of delivery would be substantially in excess of the allowance of 1/4 of 1¢ per quart, for which price the subdealers within six miles of the processing plant are willing to call for and transport the milk. The subdealers, if they continue to purchase milk from processing plants within a radius of six miles, would suffer losses ranging from $12 to $40 per week for each subdealer, by reason of the disallowance of "cartage" discount after May 1, 1953. The subdealers are mostly small independent businessmen to whom such losses would be material.
In view of the very broad powers conferred by the statute upon the Director to adopt, promulgate, issue and enforce rules, regulations and orders necessary to carry out the provisions of the act, particularly sections 7, 20, 21 and 26 of the statute (L. 1941, c. 274), we do not think the regulation of "cartage" allowances to subdealers is beyond the authority of the Director.
Nor do we believe it necessary for the Director to give public notice, conduct a public hearing, or to make findings of fact before promulgating the regulation in question. Generally speaking, in the absence of statutory or constitutional requirement, an administrative agent or agency need not grant a hearing or make findings of fact to support regulations promulgated in furtherance of the objects of the statute. State Board of Milk Control v. Newark Milk Co., supra; In re Port Murray Dairy Co., supra; Welsh Farms, Inc., v. Bergsma, supra. The regulation in question is not a price-fixing order contemplated by section 21 of the statute even though it does incidentally affect the price paid by the subdealer in dealing with discount to which he may be entitled *78 under certain circumstances. There is nothing in the statute which appears to require a public hearing or findings of fact with respect to such a regulation. Paragraph three of the regulation in question is so drawn as to affect all processors and subdealers. It is not an order or determination affecting particular individuals or particular classes of individuals or corporations.
It remains to be determined whether the regulation lacks support by substantial evidence justifying it; whether it is arbitrary, unreasonable, capricious or discriminatory, and whether it violates the provisions of R.S. 4:1-38, as alleged by plaintiffs.
The reason for the regulation under attack is expressed in its first sentence which reads:
"In order to simplify the discount regulations on sales by Processors to Subdealers, * * *."
Paragraph three of the regulation permits a discount to or credit in favor of the subdealer who transports the milk purchased by him from the plant or depot of the processor, including the return of empty bottles and cases, to the extent of "the actual cost of cartage," but places a limit upon such discounts, based upon the distance the subdealer must travel, and in the case of subdealers located within 6 miles of the processor's plant or depot, prohibits the allowance of any discount whatever. It is apparent that paragraph three of the regulation in question recognizes the fact that subdealers who go to the processor's plant and who transport the milk purchased by them, in contrast to other subdealers to whom the processor delivers milk, incur some cost and expense in such operation which justifies the allowance to the subdealer of a credit for "the actual cost of cartage." However, the regulation seems to assume that the subdealer located within six miles of the processor's plant or depot has no "actual cost of cartage" or that the cost is so nominal as to be unworthy of notice.
Paragraph three of the regulation it seems to us without reason discriminates against processors in the metropolitan *79 section, the majority of whose subdealers are located within six miles of the plant or depot of the processor, as compared with the so-called country processors who have very few subdealers within such six-mile radius of their plants. And we think it also discriminates against those subdealers located within six miles of the plant or depot of the processor as compared with the subdealers located more than six miles from the plant of the processor. In the former case the regulation would allow no compensation whatever for the time and labor of the subdealer in going to the processor's plant and transporting his milk and, in comparison to the practice prevailing prior to May 1, 1953, would cost each of said subdealers from $12 to $40 per week, whereas in the latter case, the subdealers are given an allowance designed to cover their actual costs. We fail to see a sufficient difference in the cost to a subdealer located five miles from the processor's plant, and a subdealer located seven miles from the processor's plant, to justify the disallowance of costs in one case and the allowance of costs in the other. The proofs submitted do not support such a distinction and to the extent that the regulation is not supported by the proofs, it is arbitrary and unreasonable.
Simplification of discount regulations as recited in the first sentence of the regulation under attack, presumably for the convenience of the Office of Milk Industry, is not sufficient justification for the disallowance of all "cartage" discounts to the subdealers located within six miles of the processor's plant with consequent hardship imposed upon and discrimination suffered by both the processors located in the metropolitan area and the subdealers located within six miles of such processing plants.
Finding as we do that paragraph three of the regulation, as it applies to the relationship between processors and their subdealers located within a radius of six miles of the plant or depot of the processor, prejudicially affects the substantial property rights of both the processors and the subdealers and is discriminatory, unreasonable and arbitrary, we conclude that that portion of paragraph three of Regulation *80 F-31 disallowing all "cartage" to subdealers located within six miles of the processor's plant or depot must be vacated and set aside. If "cartage" discount is to be allowed to any subdealers, it must be allowed to all subdealers at such graduated rate as may be fixed and determined by the Director.