NATIONAL DAIRY PRODUCTS CORPORATION, APPELLANT, v. FLOYD R. HOFFMAN, DIRECTOR, OFFICE OF MILK INDUSTRY, RESPONDENT.

Argued May 20, 1963—Decided July 1, 1963.

476

*Mr. Owen B. Rhoads,* of the Pennsylvania Bar, argued the cause for appellant (*Mr. George Gildea* and *Messrs. Katzenbach, Gildea & Rudner; Mr. William H. Lowery* and *Messrs. Dechert, Price & Rhoads,* of the Pennsylvania Bar, attorneys).

*Mr. William L. Boyan,* Deputy Attorney General of New Jersey, argued the cause for respondent (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

FRANCIS, J. Appellant National Dairy Products Corporation, a licensed New Jersey milk dealer, was found guilty by respondent Floyd R. Hoffman, Director of the Office of Milk Industry, of selling milk to Penn Fruit Company, Inc., a Pennsylvania corporation, in violation of certain regulations establishing dealer-store minimum prices. The penalty imposed was revocation of the dealer's license and an order to sell its milk business and interests in this State, unless within 90 days of the order National Dairy agreed to cease selling milk to Penn Fruit at less than the fixed dealer-store prices, and pay a penalty of $25,000 to the Office of Milk Industry. National Dairy's appeal from the order was certified by this court on its own motion before arguments were heard in the Appellate Division. We continued the stay of the Director's order granted by the Appellate Division.

The facts are not involved, but for purposes of perspective a short recital of them appears necessary.

National Dairy Products Corporation is a corporation of the State of Delaware, with its principal office in New York City. It is engaged in the processing, sale and distribution of dairy products in a number of states. Offices are maintained in Philadelphia, Pennsylvania, as well as plants in Philadelphia and Chambersburg, Pennsylvania, Washington, D. C. and Camden, New Jersey. The record indicates that for purposes of economy and centralized distribution, National's dairy products, after being processed at its plants elsewhere, are transported to the Camden, New Jersey plant

at which they are either picked up at the platform by the customers or delivered to them by National's trucking facilities. For example, milk in glass gallon jugs is bottled at the company's 47th Street, Philadelphia location, cream buttermilk is processed at its Tabor Avenue, Philadelphia place, cottage cheese at Chambersburg, and sour cream at Washington, D. C. These products are then assembled at Camden for sale or distribution, or both. Some processing of milk, although not in glass gallon containers, is engaged in also at Camden.

National is licensed as a milk dealer in New Jersey under *N. J. S. A.* 4:12A–1. Such a dealer is defined in the act as:

"Any person who sells or distributes milk, including on consignment or for the account of a producer, or who purchases milk from producers or other milk dealers, as herein defined, and who, in addition thereto, pasteurizes in his own plant or bottles in his own plant for sale in this State to consumers or stores or other milk dealers or processors, as herein defined, except for consumption on the premises of the producers. * * *"

Penn Fruit Company, Inc. is a Pennsylvania corporation with its principal office in Philadelphia. It operates a chain of supermarkets in New Jersey, Pennsylvania, New York, Maryland and Delaware. Eleven such markets are maintained in New Jersey; each one is licensed in the name of Penn Fruit Company to sell milk as a store.

A store is defined to be:

"A grocery store, delicatessen, food market, hospital, institution, hotel, restaurant, soda fountain, dairy products store, any governmental agency, roadside stand and similar mercantile establishments." *N. J. S. A.* 4:12A–1.

Penn Fruit has been a long-time customer of National, purchasing milk and other dairy products for its stores in Pennsylvania and New Jersey. Prior to the events giving rise to this proceeding, the method of operation between the two companies was a simple one. Penn Fruit would ascertain the needs of its individual stores in the two states, and

then place the order with National indicating the requirement (including quantities of milk) of each store. National would then deliver the stipulated gallons and other quantities of milk and dairy products from the Camden plant in its own trucks directly to each store in New Jersey or Pennsylvania. During this period, National charged Penn Fruit the minimum or above-the-minimum price established by O. M. I. for dealer-store sales.

In August 1961 a change took place in their method of operation. On May 5, 1961 the Pennsylvania Milk Control Commission issued a milk dealer's license to National. (The company is referred to frequently, both in Pennsylvania and here, as "Sealtest," the designation given to the administrative division of National involved in these transactions. See *Milk Control Commission v. Penn Fruit Company*, 410 *Pa.* 242, 188 *A. 2d* 705 (*Sup. Ct.* 1963).) Consequently, National then held dealers' licenses in New Jersey and Pennsylvania.

A milk dealer is defined by the Pennsylvania statute as:

"\* \* \* [A]ny person, including any store \* \* \* who purchases or receives or handles \* \* \* milk within the Commonwealth, for sale, \* \* \*." 31 *P. S.* § 700j–103.

Such a person cannot buy, distribute or sell milk within or without Pennsylvania unless licensed. 31 *P. S.* § 700j–401. The Commission is authorized to exempt stores (by official order) from the license requirements if all of the milk sold by them has been purchased or acquired from a Pennsylvania-licensed milk dealer. 31 *P. S.* § 700j–402. Penn Fruit has neither dealer nor store license in Pennsylvania.

In August 1961 Penn Fruit continued to give National the orders for milk and dairy products representing the requirements of its individual stores in New Jersey and Pennsylvania; National continued to charge the O. M. I. approved dealer-store prices for the New Jersey store sales. These products were delivered by National trucks from the Camden plant to the Penn Fruit New Jersey stores as in the past.

But in that month, the orders for the Pennsylvania stores began to receive different treatment. Penn Fruit gave National the orders listing the needs of its individual stores in Pennsylvania. But, as of August 14, Penn Fruit sent its own trucks from Philadelphia to National's Camden plant, picked up the orders for the Pennsylvania stores and delivered them at the individual store locations in that state by means of its own employees and equipment. According to the agreement of the parties (which O. M. I. concedes) these purchases and sales were made at National's Camden plant; delivery and transfer of title of the milk took place there also.

The new arrangement with respect to Penn Fruit purchases at Camden for the Pennsylvania stores meant that some of the products involved, perhaps all (the record is not entirely clear), engaged in double transportation between the two states. For example, as has been indicated above, the gallon jugs of milk were processed and bottled at National's 47th Street, Philadelphia plant; they were then transported to Camden, and the jugs purchased by Penn Fruit were delivered at that place to the Penn Fruit trucks which in turn brought them back into Pennsylvania for delivery to Penn Fruit stores in and around Philadelphia. The explanation for National's failure simply to deliver the milk and other dairy products to Penn Fruit in Philadelphia is that the Camden plant is maintained as a central distribution point, and that Penn Fruit is only one of the customers supplied at that place. It does appear, however, that with the advent of the new system, National ceased charging Penn Fruit O. M. I. dealer-store prices. O. M. I. dealer-subdealer prices were substituted. These prices were substantially lower than those applicable to store sales.

A subdealer is defined as:

"Any milk dealer who does not own, operate or lease a plant and does not pasteurize or bottle milk, but who purchases milk from a milk dealer or processor and sells or resells to a store or consumer, but the aforesaid definition shall not be deemed to include a store." *N. J. S. A.* 4:12A–1.

Subdealers represent a separate class of milk dealer commonly known to the trade in New Jersey for many years. They are independent businessmen, representing an operation between the dealer and the store or home consumer. They may be described in simple terms as milk delivery men who are in business for themselves; they deliver door-to-door to homes, and they may sell and deliver to licensed stores. They must be distinguished from milk delivery men who are employees of dealers and simply transport milk to customers of their employer-dealer.

The Legislature, by virtue of the statute, *N. J. S. A.* 4:12A–1, recognized this independent class of milk entrepreneur; established a separate classification for him, *i. e.,* subdealer, and required that such an operator be licensed as a condition precedent to recognition and engagement in the business. The classification supports another, even more significant conclusion; in adopting the Milk Control Act, the lawmakers intended not only to recognize the subdealer but to sanction, continue and preserve his existence.

Order 60–2 of the O. M. I. fixing minimum prices for milk sales in various classes of sellers and purchasers effectuated the legislative intent by establishing separate prices for the subdealer. Listing of prices is not necessary for present purposes. Suffice it to say that minimum prices for dealer to store, dealer to consumer, or store to consumer sales are higher than those applicable to dealer to subdealer sales. The differential gives recognition to the independent subdealer operation. Furthermore, O. M. I. took cognizance of the fact that, in some cases, the dealers delivered the milk purchases to the place of business of the subdealers, while in other cases subdealers picked up their purchases of milk in their own trucks at the place of business of the dealer, and either made deliveries immediately from that point to the customers, or brought the milk to their business base and trucked it to their customers from there. By way of adjustment for the latter method of operation, O. M. I. established a cartage allowance for subdealers. A small discount per unit, such as quart for

example, was authorized; the allowance varied depending on the transportation distance between dealer and subdealer depots. Regulation H–6; see *Garden State Farms v. Armstrong*, 31 *N. J. Super.* 61 (*App. Div.* 1954).

In this connection, it is important to note that the regulations make no provision for cartage allowance to stores in the event they pick up their milk at the plant or distribution center of the dealer and transport it by their own equipment to their stores. Undoubtedly, this accounts for the method of operation between Penn Fruit and National prior to August 14, 1961, *i. e.*, National delivered Penn Fruit purchases to both New Jersey and Philadelphia area stores of the latter, charging dealer-store prices therefor.

Penn Fruit has no subdealer's license. There is nothing in the record to indicate that prior to the inception of the new *modus operandi* on August 14, 1961, an attempt was made to obtain one. It is plain from these proceedings and from conferences between National and O. M. I. before the order to show cause was issued, that Penn Fruit would not have been considered by O. M. I. as qualified to receive a subdealer's license. In any event, National decided Penn Fruit should be classed as such a dealer and, as of August 14, 1961, began to charge it the lower subdealer prices on the sales to the Pennsylvania stores, and to grant a cartage allowance because Penn Fruit trucks picked up the products at the Camden depot and allegedly distributed them itself to its Pennsylvania stores. "Allegedly" is used only because O. M. I. made no thorough investigation of the products bought for, and delivered by, Penn Fruit trucks to its stores in Pennsylvania. The trucks were not followed or the deliveries physically traced to make certain that the interstate run was made in all cases and that no products ostensibly bought for Pennsylvania stores were delivered to New Jersey stores. According to O. M. I., it does not have sufficient facilities or personnel to engage in a thorough investigation. In fairness, it should be said that the records of National presently before us do not support a view of diversion of Pennsylvania purchases to New Jersey stores.

And as has been said, neither subdealer prices nor cartage allowances were granted by National for the products purchased for, and delivered to, the New Jersey stores by Penn-Fruit trucks.

One of the complaints made by O. M. I. against National is that, assuming a cartage allowance to Penn Fruit was permissible under Regulation H–6, the discount was excessive. Such violation was found by the Director and is supported by the record. It is of incidental consequence, however, and obviously was inadvertent rather than willful.

The Pennsylvania Milk Control Law did not establish a separate subdealer classification for licensing purposes, nor has the Milk Control Commission of that state authorized different minimum prices for such dealers. See, *Milk Control Commission v. Penn Fruit Company, supra.* Penn Fruit was not a milk dealer or handler in Pennsylvania, nor licensed as such. It operated as a store at all times, and was exempted by the Commission from the requirement for license under the provision of the statute which authorizes exemption for stores "selling milk, all of which has been purchased or acquired from a licensed milk dealer or handler." 31 *P. S.* § 700j–402.

When National began to treat Penn Fruit as a subdealer, the latter became able to buy milk in New Jersey for its stores in and around Philadelphia at considerably lower prices than would have been applicable under the Pennsylvania Commission regulations if the purchases and sales were made in Pennsylvania. Thus, the Penn Fruit margin of profit on its store sales was increased by reason of the differential and the cartage allowance. It had a distinct advantage over stores which were buying milk from dealers operating wholly within Pennsylvania. The Commission, apparently feeling that Penn Fruit should no longer be treated as a license-exempt store, because its milk was being purchased in New Jersey from National, a licensed New Jersey dealer, and seemingly concerned lest other stores similarly situated would begin to make and transport their purchases from National

in Camden to the disadvantage of Pennsylvania producers, sought an injunction against the practice. The injunction was denied. The theory seems to have been that National had acquired the licensed status of a Pennsylvania milk dealer, and as such it had sold milk to Penn Fruit for resale in Pennsylvania. Therefore, Penn Fruit continued to qualify as an exempt store because all of the milk had been purchased from a Pennsylvania licensed dealer. The court did not consider that, in making the sales in New Jersey, National was operating as a milk dealer of New Jersey, licensed as such, and not as a Pennsylvania dealer. *Milk Control Commission v. Penn Fruit Company, supra*, 188 *A. 2d*, at *pp.* 708–709.

Subsequent to the injunction denial by the trial court in Pennsylvania, the order to show cause in the present proceeding was issued. Admittedly it was instigated by the Pennsylvania Commission as a result of the proof in its case that the purchases, sales and deliveries involved were New Jersey sales completed in this State with the title to the goods passing here.

■■ The position taken by O. M. I. is that under the circumstances detailed above, Penn Fruit does not qualify as a subdealer with respect to the sales of milk destined for the Pennsylvania stores, cannot be treated as such by National, and therefore cannot receive the benefit of the lower subdealer minimum prices on such milk sales. Moreover, O. M. I. says that under the statutory definition Penn Fruit is a store and must be charged the higher dealer-store minimum prices. It points out that these prices were charged by National on all the sales prior to August 14, 1961. Such prices were applied because Penn Fruit was regarded as a store. After August 14, 1961 the same dealer-store price practice continued with respect to the sales and delivery of milk to its New Jersey markets. But, according to National, when Penn Fruit began personally to truck its milk purchases from the Camden plant to its stores in and around Philadelphia, its statutory status was transformed from that of store

to subdealer. The altered status, claims National, was projected into being by the substitution of Penn Fruit trucks as the means of transportation to the out-of-state stores. On the other hand, O. M. I. contends the mere fact that a store transports its own purchases of milk from the dealer's place of business to its own does not alter its basic character as a store.

There is no doubt that Penn Fruit fits the descriptions of a store under the similar definition promulgated by the milk control laws of both New Jersey and Pennsylvania. *N. J. S. A.* 4:12A–1, *supra*; 31 *P. S.* § 700j–103. Its operation of the places of business in and around Philadelphia which are involved here was spoken of by the Pennsylvania Supreme Court as the conduct of stores. *Milk Control Commission v. Penn Fruit Company, supra.* Obviously, if a store sends its own trucks to the dealer's distribution point to pick up its milk purchases, its status as a store would not be transformed into that of a subdealer. The fact of transportation is of itself not meaningful in that connection. The crucial fact distinguishing a store from a subdealer is the nature of the business. A subdealer is neither a dealer nor a store; he is the operator of an independent business standing squarely between the dealer and store, or dealer and consumer. He buys the milk from the licensed dealer at the lower prices fixed for his class of handlers and sells it to his own customers in his own interest. The statute does not require, as a condition to qualification for the class, that the subdealer transport the milk he purchases from the dealer's place of business to his own distribution point. The only relevance such carriage has in milk price regulation is that it qualifies the subdealer for a cartage allowance.

There is no suggestion that if Penn Fruit used its trucks to carry the milk for the New Jersey stores from National's Camden plant to the various locations in this State, it would thereby become a subdealer. It would still be a store sending its own employees to pick up its milk purchases. The situation is not different in substance when Penn Fruit, as a store

operator, takes delivery of the milk orders at the New Jersey plant and trucks them over the Walt Whitman Bridge to its markets in and around Philadelphia. It continues to be a store, using its employees to pick up its milk purchases from National. The parties agree that New Jersey sales of milk are involved. They are completed here, delivery and passage of title takes place here. Such sales are subject to regulation under our milk control act which classifies the purchaser, Penn Fruit, as a store for price-fixing purposes. There would appear to be no sound reason why a New Jersey sale to a store becomes a sale to a subdealer because the store's employees truck the product of the sale a relatively short distance into a sister state for distribution to its various markets there. Under the circumstances, we agree with the Director of O. M. I. that National violated Order 60–2 in selling the milk in question to Penn Fruit at subdealer prices.

██ National contends that the Director's finding and alternative order of license revocation, or abandonment of use of subdealer prices for milk sales to Penn Fruit Pennsylvania stores and payment of penalty for violation of the price-fixing regulation, constitutes an unconstitutional interference with interstate commerce. We cannot agree.

It has been settled for almost 30 years that the production and distribution of milk are so intimately identified with the public welfare, under the circumstances described in our statute, that reasonable price regulation of its sale has constitutional sanction. *Nebbia v. New York*, 291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940 (1934); *Abbotts Dairies, Inc. v. Armstrong*, 14 *N. J.* 319 (1954). No proof was offered in this proceeding to attack the minimum prices applicable to the various categories of sales as arbitrary or unreasonable. Accordingly, the presumption of validity controls.

██ The sales with which we are concerned are New Jersey transactions. They are essentially local in their character and are properly made subject to the pertinent price-fixing order. Assuming, without deciding, that transportation of the milk by Penn Fruit from Camden to points in and around

Philadelphia gave the sales an interstate commerce hue, the problem is not whether such commerce is interfered with but whether the proved interference constitutes an undue or excessive burden on that commerce. Incidental interference or indirect burdens, which find their source and justification in a reasonable exercise of the police power of a state affected by the transaction, are not transgressive of the United States Constitution, in the absence of some controlling or superseding federal enactment or regulation. Regulation of the price of milk was directed by the Legislature to meet the requirement of local conditions and to protect the public interest from what it found to be the adverse effects of those conditions.

The statute created the dealer, subdealer and store classifications for sellers of milk. It is not suggested they are arbitrary or discriminatory, or that the minimum prices applicable to sales in each category suffer from similar invalidity. As we have said, the Director was justified in designating the sales in question as dealer to store rather than dealer to subdealer sales. When the transactions were completed in New Jersey by delivery of the milk orders at the Camden platform of National, Penn Fruit was free to do what it wished with the milk. Transportation to Pennsylvania was not compulsory. Adequate supervision by O. M. I. to determine the actual places of delivery was infeasible because of administrative difficulty, inconvenience, expense and lack of sufficient personnel. These factors and the substantially local character of the transactions provide strong support for the view that reasonable state regulation of the sales was permissible even if recognition is given to their asserted interstate aspects. *Carmichael v. Southern Coal & Coke Co.,* 301 *U. S.* 495, 57 *S. Ct.* 868, 81 *L. Ed.* 1245 (1937); *Superior Oil Co. v. Mississippi ex rel Knox,* 280 *U. S.* 390, 50 *S. Ct.* 169, 74 *L. Ed.* 504 (1930).

Under all the circumstances disclosed by the record before us, we cannot say the application of the O. M. I. established minimum dealer-store prices to the sales involved constitutes

a prohibited burden on interstate commerce. *Milk Control Bd. v. Eisenberg Farm Products,* 306 *U. S.* 346, 59 *S. Ct.* 528, 83 *L. Ed.* 752 (1939); *Eastern Air Transport, Inc. v. South Carolina Tax Commission,* 285 *U. S.* 147, 52 *S. Ct.* 340, 76 *L. Ed.* 673 (1932); *W. W. Cargill Co. v. Minnesota,* 180 *U. S.* 452, 470, 21 *S. Ct.* 423, 45 *L. Ed.* 619, 627 (1901); *Cf. Head v. New Mexico Board of Examiners in Optometry,* 374 *U. S.* 424, 83 *S. Ct.* 1759, 10 *L. Ed.* 2d 983 (1963).

■ The amount of the penalty stemmed from the Director's belief and finding that National willfully and knowingly devised an illegal scheme to circumvent the minimum price structure established for New Jersey milk sales. But the legality of the plan was an arguable question and we do not believe the substantial evidence supports the view that the intention was to engage in a flagrantly-illegal effort to frustrate and circumvent the dealer-store price minimums. *Cf. Superior Oil Co. v. Mississippi ex rel Knox, supra.* For an example of blatant and obvious attempt at circumvention of a minimum price order, see *Milk Control Commission v. McAllister Farm Dairy,* 384 *Pa.* 459, 121 *A.* 2d 144 (*Sup. Ct.* 1956).

Under all the circumstances, we hold that the portion of the alternative penalty which imposes the $25,000 is excessive and should be reduced to $1,000. Accordingly, the order for revocation of National's license as a milk dealer shall be recalled if, within 30 days from the date of our mandate, the reduced monetary penalty is paid, and an agreement is made forthwith to cease treating Penn Fruit as a subdealer in connection with the sales of milk described herein. The stay of the Director's order is vacated, effective immediately.

Modified.

HALL, J. (dissenting). The important issue in this case is whether New Jersey may validly fix the minimum price for the sale of milk and milk products in this state by a processor-dealer (National) to a Pennsylvania customer (Penn Fruit)

for transportation and resale by that customer to consumers through its stores in that state.

There is no question but that the ultimate sales to consumers in Pennsylvania comply with the laws of that state. Pennsylvania has specifically held that the purchases from appellant in New Jersey violate no law of Pennsylvania and so do not adversely affect any protected interest of that state. *Milk Control Commission v. Penn Fruit Co.*, 410 *Pa.* 242, 188 *A.* 2*d* 705 (*Sup. Ct.* 1963).

The milk processed by appellant at its New Jersey plant is produced 29% in this State and the remaining 71% in Maryland, Delaware and Pennsylvania, with the greatest proportion coming from Maryland. (188 *A.* 2*d,* at *pp.* 706–707.) Milk and milk products processed in appellant's plants in other states and brought to the New Jersey plant for distribution to customers in New Jersey and Pennsylvania are produced in states other than New Jersey. There is no contention that the original producers did not receive from National the price required to be paid them by the laws of the state of production and there is no evidence that the payment of such prices to New Jersey producers in the future would be endangered by reason of the price and manner by which National has been selling to Penn Fruit in New Jersey.

Nor do I see any justification for respondent's conclusion that the appellant's method of using its New Jersey plant for distribution in New Jersey and Pennsylvania of all its milk products, no matter where processed or produced, was not followed for a legitimate purpose but as a subterfuge to attempt to evade milk control regulations of New Jersey and Pennsylvania. Such an evil intent should never be ascribed without clear proof. On the contrary, it seems evident to me that appellant's method of doing business is entirely proper and designed to accomplish efficiency and economy in accordance with its business judgment. There is concededly no evidence that Penn Fruit has transported any of the milk, purchased from National and taken to Pennsylvania, back into New Jersey for retail sale in its stores here nor should there

be any innuendo that it intends so to do in the future. Of course, it undoubtedly adopted deliberately the present means of purchasing milk from appellant in New Jersey for its Pennsylvania stores for economic reasons of its own; it has a perfect right to do that and is not to be condemned for it unless the price paid violates some valid and constitutionally applicable law or regulation of this State. That Penn Fruit may obtain an economic advantage over its Pennsylvania competitors is not relevant. The situation is no different from that where, for example, a New Jersey processor-dealer purchases milk produced in another state where the prescribed minimum price to the producer is lower than that required to be paid by his competitors who obtain their milk from New Jersey producers. This he may not be prevented from doing. *Baldwin v. G. A. F. Seelig*, 294 *U. S.* 511, 55 *S. Ct.* 497, 79 *L. Ed.* 1032 (1935). See also *Highland Farms Dairy v. Agnew*, 300 *U. S.* 608, 57 *S. Ct.* 549, 81 *L. Ed.* 835 (1937).

The preamble to the New Jersey Milk Control Act, *N. J. S. A.* 4:12A–1, *et seq., L.* 1941, *c.* 274, *pp.* 713–714, recites (as did the original statute, *L.* 1933, *c.* 169) a legislative declaration of emergency affecting the milk industry of the State (to continue until the Legislature designates the termination thereof) and the necessity of control, "in the interest of the health and welfare of the citizens of this State * * * to prevent possible curtailment of a sufficient supply of fresh, wholesome, sanitary milk for our citizens * * *." It particularizes by stating the existence or threat of unfair, unjust, destructive or demoralizing practices "likely to result in the demoralization of the agricultural interests of this State engaged in the production of milk" and prescribes the key to regulation by declaring the policy and intent of the statute to be to prevent such practices "by providing a reasonable return for the milk producer * * *," *i. e.*, the New Jersey farmer producing milk.

The provisions of the statute with which we are concerned, empowering the Director of the Office of Milk Industry to fix prices, go beyond the preamble. *N. J. S. A.* 4:12A–22. This

section authorizes the fixing of minimum prices to be paid to the producer (now supplanted in North Jersey by a federal marketing area order and about to be supplanted in the rest of the State by the promulgation of a similar order), to be charged by milk dealers to other milk dealers, processors, subdealers and stores, to be charged by processors to subdealers, to be charged by subdealers to stores and to be charged to consumers under various methods of distribution, "as will best insure a sufficient quantity of fresh, pure and wholesome milk to the inhabitants *of this State."* (Emphasis supplied) In fixing such prices, "[t]he director may take into consideration * * * the amount necessary to yield a reasonable return to the producer *and to the milk dealer, processor or subdealer."* (Emphasis supplied)

The result has been the establishment of an octopus-like price control structure, which, it may be parenthetically observed, extends considerably beyond that now in force in the neighboring states of New York, and, to some extent, that in effect in Pennsylvania.[1] Its nature and operative effect have important relation to this case. The minimum price paid the New Jersey farmer, the intended basic beneficiary of the law, by a dealer is the same no matter how his milk is distributed to the ultimate fluid milk consumer. The price the dealer-processor has to charge varies greatly, however, depending upon the method of distribution. Taking the prices involved in this case with respect to a quart of Grade A milk in the particular marketing area, as prescribed by

---

[1] For a comprehensive review and analysis of state milk price regulation, its history, basis and effect, see Note, "Government Regulation of Prices: A Study of Milk Control in Pennsylvania," 109 *U. Pa. L. Rev.* 555 (1961). It is interesting to note that in recent years two states, Georgia and South Carolina, have declared their statutes unconstitutional on economic substantive due process grounds, *ibid.*, at *p.* 566, and others have substantially modified or abandoned regulations, presumably because the scheme could not be made to work effectively or fairly. The upsetting interstate aspects of the industry, as well as the impact of superseding federal marketing area orders fixing producer prices, very probably has had a good deal to do with this change in attitude by many states in late years.

Order 60-2, if the dealer sells directly to a store, he must charge a minimum delivered price of 27 cents, the same price a subdealer must charge a store. If he sells to a subdealer, the minimum price is only 22 cents, including delivery, with a reduction for cartage allowance if the subdealer picks up his milk at the dealer's depot. This is the price at which National sold to Penn Fruit.[2] If the subdealer sells to a store, the minimum is the afore-mentioned 27 cents. The minimum price a store must charge the consumer, whether it buys from a dealer or subdealer, is 29 cents. Home delivery, by either dealer or subdealer, carries a minimum of 30½ cents.

It is plain to see that these classifications result in subsidization of the subdealer at the expense of the consumer who wishes to purchase milk at a store, the cheapest possible outlet. This, the Director candidly conceded at oral argument. The 22-cent dealer-subdealer price, less cartage allowance, is presumably based on a fair return to the dealer. The dealer-store price of 27 cents gives the dealer an additional profit of 5 cents, less the cost of delivery to the store, in order that the subdealer-middleman may remain in business and make a profit on his wholesale store sales and retail home deliveries. I have strong doubt that this differential is constitutionally valid, even from an intrastate point of view. See *Lampert Dairy Farm, Inc. v. Hoffman*, 37 *N. J.* 598 (1962). Beside state constitutional questions, Federal equal protection may be involved as well as whatever is left of economic substantive due process. As to the latter, a state police power law or regulation must not only be reasonable, but "the means selected shall have a real and substantial relation to the object sought to be attained." *Nebbia v. New York*, 291 *U. S.* 502, 525, 54 *S. Ct.* 505, 511, 78 *L. Ed.* 940, 950 (1934). (While the question was not raised by appellant's brief in this fashion, it was explored at oral argument.)

---

[2] I thoroughly agree with the majority that there is no sound basis for justifying this price, as conforming to New Jersey's price schedule, on the thesis that Penn Fruit is, in effect, a subdealer.

But if valid as far as intrastate transactions are concerned, the matter still has bearing on the question of federal unconstitutionality with respect to interstate transactions.

As has been indicated, the New Jersey producer gets no more or no less for his milk destined for fluid consumption whether his dealer, after processing, sells it to a New Jersey subdealer or store or delivers it himself to a family doorstep, or whether the dealer sells it for distribution without the State. And since the Legislature has not even attempted to provide that the dealer may not sell his processed milk as he pleases, as far as destination or method of distribution is concerned, interstate sales cannot be said to adversely affect a sufficient supply of fresh, wholesome, sanitary milk for New Jersey citizens. It would certainly seem that no New Jersey producer, subdealer, store or consumer can be injured, directly or indirectly, by the price which a dealer charges for milk which goes to another state for distribution. No object of the bounty, so to speak, of the New Jersey regulatory scheme being harmed thereby, it consequently should follow that New Jersey has no realistic, legitimate interest warranting protection by state price regulation of such a sale.

The majority assumes, as is the fact, that New Jersey's insistence on National's charging Penn Fruit its dealer-store price for what is obviously a transaction in interstate commerce, no matter where title may technically pass or delivery take place, is a state regulation of such commerce. I agree, of course, that not every such regulation is an unconstitutional burden by any means, for it is axiomatic by this time not only that the burden must be undue, but also that ordinarily state control over subjects relating to the health, life and safety of its citizens will not be struck down even though it may affect the commerce of the country. The latest expression of the prevailing approach is found in *Head v. New Mexico Board of Examiners in Optometry*, 374 U. S. 424, 83 *S. Ct.* 1759, 10 *L. Ed. 2d* 983 (1963). But, as Justice Brennan mentioned in his concurring opinion in the same case, "[s]uch regulation might well exceed the scope of

the State's legitimate interests * * *. *Cf. Bibb v. Navajo Freight Lines, Inc.,* 359 *U. S.* 520, 79 *S. Ct.* 962, 3 *L. Ed. 2d* 1003; *Southern Pacific Co. v. Arizona ex. rel. Sullivan,* 325 *U. S.* 761, 775, 65 *S. Ct.* 1515, 1523, 89 *L. Ed.* 1915." 83 *S. Ct.,* at *p.* 1772. If it does, and is more than an incidental burden, it is violative of the commerce clause. As previously pointed out, in my opinion, application of New Jersey's price regulations to the interstate sale of milk here involved does exceed the scope of this state's legitimate interest and, in fact, serves no worthy local interest at all. Its effect is certainly more than incidental. I take it the clear implication of *Highland Farms Dairy v. Agnew, supra,* 300 *U. S.* 608, 57 *S. Ct.* 549, 81 *L. Ed.* 835 is that the sale before us is not properly subject to price regulation by New Jersey.

I do not think it can be soundly said that this State's price regulation of the National-Penn Fruit sale is saved because, if it were not, administrative difficulties would arise in verifying the interstate terminus of milk so sold and some of it might be brought back to New Jersey stores, which would thereby obtain it at less than the fixed dealer-store price for intrastate sales of that character. The case is not factually like *Milk Control Board v. Eisenberg Farm Products,* 306 *U. S.* 346, 59 *S. Ct.* 528, 83 *L. Ed.* 752 (1939), relied upon to support the thesis. There the matter of payment of state-fixed producer prices for milk being shipped directly to another state was involved—a subject in which the producer state had a vital interest, for the economic welfare of *all* its dairy farmers. That in itself might well be enough to sustain a price regulation at that level applicable no matter what the destination of the milk. In any event, differing scales of payment obviously would make it practically impossible to assure producers of the state-fixed minimum for their intrastate milk. This is not true here. Subterfuge should not be presumed as the probable course of conduct. The whole thesis seems in any event to be so trifling as not to warrant recognition.

It is further suggested that, somehow, the dealer-store and dealer-subdealer price dichotomy redounds to the indirect and

ultimate benefit of the New Jersey producer, rather than just to the subdealer. I fail to follow the thought and I have earlier pointed out why I believe there is no realistic relationship. But, considering the idea more broadly, the answer to this kind of argument was best stated by Justice Cardozo in *Baldwin v. G. A. F. Seelig, supra,* 294 *U. S.* 511, 55 *S. Ct.* 497, 79 *L. Ed.* 1032, where, in striking down a New York provision prohibiting the sale of milk bought outside the state unless the price paid to the producers was one that would be lawful upon a like transaction within the state, he said:

"The argument is pressed upon us, however, that the end to be served by the Milk Control Act is something more than the economic welfare of the farmers or of any other class or classes. The end to be served is the maintenance of a regular and adequate supply of pure and wholesome milk, the supply being put in jeopardy when the farmers of the state are unable to earn a living income. *Nebbia v. New York,* [291 *U. S.* 502, 54 *S. Ct.* 505, 78 *L. Ed.* 940, 89 *A. L. R.* 1469], *supra.* Price security, we are told, is only a special form of sanitary security; the economic motive is secondary and subordinate; the state intervenes to make its inhabitants healthy, and not to make them rich. On that assumption we are asked to say that intervention will be upheld as a valid exercise by the state of its internal police power, though there is an incidental obstruction to commerce between one state and another. This would be to eat up the rule under the guise of an exception. Economic welfare is always related to health, for there can be no health if men are starving. Let such an exception be admitted, and all that a state will have to do in times of stress and strain is to say that its farmers and merchants and workmen must be protected against competition from without, lest they go upon the poor relief lists or perish altogether. To give entrance to that excuse would be to invite a speedy end of our national solidarity. The Constitution was framed under the dominion of a political philosophy less parochial in range. It was framed upon the theory that the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union and not division." (291 *U. S.* 502, 54 *S. Ct.* 505, 79 *L. Ed.,* at *p.* 1038).[3]

3 This contention was referred to in *Head, supra,* 83 *S. Ct.* 1759 as one "in which a state seeks to justify a statute as a health measure on the *attenuated theory* that the economic well being of a profession or industry will assure better performance in the public interest." (Emphasis supplied) *Baldwin* is cited. 83 *S. Ct.,* at *p.* 1762, 31 *L. W.,* at *p.* 4644, *n.* 4.

I would reverse the determination and order of the Director finding appellant guilty of selling milk to Penn Fruit below the minimum price.

*For modification*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, SCHETTINO and HANEMAN—6.

*For reversal*—Justice HALL—1.